# MICHAEL J. SLIFKA, P.E.



*3221 Conservancy Lane*
*Middleton, WI 53562*
**Fire Investigation, Analysis & Fire Engineering Design**
*E-MAIL:* firepro1pe@aol.com
*608/827-5241*
*FAX: 608/827-5243*
*CELL PHONE: 608-692-3096*
*Web Site: www.michaelslifka.com*

# FIRE PROTECTION ENGINEERING INVESTIGATION & ANALYSIS

**Re: AMBER NICOLE LOMPE, v. SUNRIDGE PARTNERS, LLC; and APARTMENT MANAGEMENT CONSULTANTS, L.L.C.,**

**US DISTRICT COURT**
**FOR THE DISTRICT OF WYOMING**
**CIVIL NO. 12CV088J**

**Date of Incident: 2/1/2011**

**Date of Report: May 9, 2013**

1

**ASSIGNMENT**

On February 8, 2013, I was contacted by Attorney Tyson Logan, The Spence Law firm, LLC, Jackson, WY concerning my background, experience, credentials and fees and subsequently retained for the purpose of consulting on the carbon monoxide poisoning of Amber Nicole Lompe at the Sunridge Apartments in Casper, WY on February 1, 2011 and the resulting law suit..

My assignment was to review a case file submitted to me by Mr. Logan consisting of pertinent depositions and their exhibits, various case motions, other supporting documents and related national standards as a base line combined with an onsite visit to Sunridge Apartments to determine and advise Mr. Logan via a professional engineering report as to whether the file and the visit supported the findings and conclusions of the Plaintiff's case.

What follows is that review and report based on the information supplied by Mr. Logan and the onsite visit, fire protection engineering principals, my professional background in fire protection engineering focused on combustion, combustion by-products including carbon monoxide and the proper installation and maintenance of gas fired furnaces developed over the last 47 years of active practice in this field of endeavor. I reserve the right to amend and update my findings and opinions as new information is provided to me.

MATERIAL REVIEWED:

1) Plaintiff's Complaint & Demand for Civil Trial
2) Deposition of Amber Nicole Lompe
3) Deposition of Stephanie Brooks
4) Deposition of Candace Capitelli
5) Deposition of Michael Coryell
6) Deposition of Michael Few
7) Deposition of John Haid, JR.
8) Deposition of Scott Kemberling
9) Deposition of Amber Wright Barrett
10) Deposition of Jeffrey Ctvrtlik
11) Affidavit of Lynn Messenbrink
12) Defendants' motion for Summary Plaintiff's Response to Defendants' Motion For Summary Judgment
13) Land America Property Condition Report of the Sunridge Apartments dated July 27, 2007
14) Maintenance Expenditure Budgets for Sunridge Apartments for 2008, 2009 & 2010
15) Apartment Management Consultants (AMC) Invoice of 3/10/2011 for purchase of CO Detectors
16) AMC Incident Report of 10/9/09 for the CO poisoning of Michael Few
17) AMC Incident Report of 2/1/11 for the CO poisoning of Amber Nicole Lompe
18) Casper WY Fire Department Incident Report of 2/1/2011
19) Timeline of Notice and/or Occurrence of Dangerous Conditions Involving Gas Furnaces at Sunridge Apartments in the years 2007 through 2011
20) Photos and observations from site visit on April 29, 2013

21) Uniform Mechanical Code 1973 Edition
22) International Building Code 2009 Edition
23) International Fire Code 2009 Edition
24) International Mechanical Code 2009 Edition
25) International Fuel Gas Code 2009 Edition
26) **Wyoming Statute 1977, Title 1. Code of Civil Procedure, Chapter 21. Procedure and Actions, Article 12. Residential Rental Property, § 1-21-1202. Duties of owners and renters; generally & W.S.1977 1-21-1203 Owner's duties; notice by renter of noncompliance; duty to correct; exceptions; termination of rental agreement; liability limited.**

## FINDINGS- Based on Review of the Case File

1) The 96-unit Sunridge Apartments were originally constructed in 1979.
2) Sunridge Partners bought the Apartments in 2007, and hired AMC to manage the property beginning in November 2007.
3) Sunridge Partners hired Land America to inspect the Apartments and issue a Property Condition Report.
4) The Report was issued to Sunridge Partners on July 27, 2007 and found that "capital replacement reserves over the term of the report would be required for items including forced air furnace replacements."
5) The Report warned that the Apartments' HVAC system was "[s]atisfactory, however some short term and/or immediate attention is required or recommended, primarily due to the normal aging and wear of the building system, to return the system to a good condition."
6) The Report called for the replacement of the outdated forced air furnaces, which were 28-years old at the time of the Report, and allocated funding "for ongoing expected replacement of these units."
7) The Report found that the 28-year-old furnaces had an "Expected Useful Life" EUL of 25 years.
8) The Report estimated a cost of about $800 to replace a furnace.
9) The original 1979 furnaces still have not been replaced at the Apartments.
10) The furnace in Ms. Lompe's apartment was 32 years old when she was poisoned.

3

11) A cracked heat exchanger is the highest priority safety risk that an HVAC professional should be concerned about – it is a red flag – because this kind of failure could be lethal.

12) AMC did not provide safety training for employees like Mr. Few, the property manager or Scott Kemberling, the maintenance man; and AMC did not provide any HVAC or carbon monoxide training.

13) AMC expected Mr. Few and Mr. Kemberling to be able to determine when a call to an HVAC professional was necessary, even though they did not know what they were looking at in dealing with furnaces.

14) The aging, dangerous furnaces were left in service, and were not inspected or maintained.

15) Mr. Kemberling further testified that he talked with HVAC professional John Haid, who told him that he could inspect the furnaces and maintain them at the Apartments on an annual basis to keep the tenants safe if Sunridge were willing to pay for such a service.

16) Mr. Kemberling even got quotes from heating contractors to perform inspections and maintenance on the Sunridge furnaces, but AMC never acted on the bids that Mr. Kemberling provided to AMC. Inspections were never performed.

17) Similarly, Mr. Few and former manager Kristine Kear specifically discussed obtaining a bid from Mr. Haid to perform annual "preventative maintenance" on the furnaces before the time Amber Lompe was poisoned by her furnace but no such inspections or maintenance was ever performed.

18) Mr. Few and Mr. Kemberling occasionally performed the simple task of changing the filters on some of the furnaces, but they had no training or understanding of how heat exchangers work or whether a furnace was operating safely.

19) To this day, no HVAC professional or anyone else has performed system-wide cleaning and maintenance on the fleet of (now) 34-year-old furnaces at the Apartments.

20) Untrained employees were tasked with the job of guessing if and when a furnace might fail and hurt a tenant; AMC and Sunridge did not take reasonable steps to actually make sure the furnaces – and their tenants – were safe.

21) Heat exchanger failure is entirely predictable and guaranteed with old, unmaintained furnaces.
22) Heat exchanger failure is a sign that the fleet of furnaces at Sunridge Partners had exceeded their useful safe life.
23) Sunridge had actual and constructive knowledge that the furnaces were years past their safe expected useful life, yet they continued to run the units, without even conducting the simplest of routine preventative maintenance on the furnaces.
24) As Land America recommended to Sunridge Partners at the time of purchase of the Sunridge Apartments, forced air furnaces of the (then) 28 years of service must be replaced for the safety of the tenants.
25) This Land America recommendation was based on the known expected useful life of gas furnaces (particularly their heat exchangers) of 20 to 25 years compared to, at the time of Land America's assessment that the furnaces were at least 28 years of age.
26) Despite knowing that the furnaces were years past their usable and safe life, and despite knowing that annual inspections and maintenance of the furnaces was available and reasonable, Sunridge Partners and AMC continued to run the old furnaces without any maintenance through 2007, 2008 and 2009.
27) For Sunridge Partners and AMC to have properly made the decision to continue to operate these aged furnaces in spite of Land America's recommendation, they would have needed a comprehensive, furnace-by-furnace inspection by a trained, certified professional to determine the actual physical conditions of each furnace. To do otherwise, which is what was done, was reckless behavior on the part of Sunrise Partners and AMC, as further demonstrated in what follows immediately below.
28) In 2009 Sunridge and AMC were warned of just how dangerous the (then) 31-year-old furnaces were: Mr. Few suffered carbon monoxide poisoning from a furnace on the property.
29) On October 9, 2009, one of the 1979-vintage furnaces with a cracked heat exchanger leaked carbon monoxide into the clubhouse/office on the property. Mr.

Few started to feel sick while he was working in the area, and ultimately was taken to the emergency room where he was found to have CO levels of 6.1% in his blood.

30) Mr. Few was treated with oxygen at the hospital; inexplicably, other than a workers compensation claim, no AMC manager or corporate official ever even discussed the incident with Mr. Few again. Indicative of a lack of concern of AMC Management over employee and tenant safety.

31) The carbon monoxide incident that injured Mr. Few in 2009 was one of many incidents involving the Apartments' 1979-era furnaces between 2007 and the time Lompe was poisoned, that served to warn Sunridge and AMC that the furnaces needed to be replaced, or at a minimum, inspected, cleaned, and maintained

32) Numerous additional failures and gas leaks served as real time warnings to Sunridge and AMC that the aged fleet of furnaces were not safe, were failing and needed to be replaced for tenant safety. These events include:

•**January 23, 2009**, Mr. Haid cleaned a heat exchanger after a gas leak was reported;

•**October 9, 2009**, Mr. Few was poisoned by carbon monoxide at the Sunridge Office (clubhouse);

•**January 4, 2010**, Mr. Haid was called out to work on a furnace that was "blowing back" carbon monoxide in unit 314;

•**January 5, 2010**, Mr. Haid was called out to clean two (2) separate furnaces in units 221 and 211;

•**January 6, 2010**, an emergency carbon monoxide leak was reported in unit 441, and the complex was evacuated;

•**February 15, 2010**, another carbon monoxide leak was noted;

•**June 3, 2010**, Mr. Haid cleaned a burner in unit 331's furnace;

•**September 16, 2010**, Mr. Haid replaced a leaking vent pipe at the Apartments, 300 building;

•**October 28, 2010**, a tenant called Source Gas complaining of a gas smell in the apartment when the furnace came on;

•**December 3, 2010**, Mr. Haid cleaned the furnace in unit 312.

6

33) Even with **ALL** of the service calls related to failing and/or carbon monoxide leaking furnaces, indicative of the age of the fleet of furnaces being well past their expected safe useful life, Sunridge and AMC still did not replace the furnaces.
34) On February 1, 2011, less than five months after Amber Lompe moved in, she was poisoned by the 32-year-old furnace spilling dangerous levels of carbon monoxide gas into her apartment.
35) The furnace had not been inspected or maintained, other than occasional filter replacements, in at least 4 years, since the time Sunridge Partners bought the Apartments and AMC began to manage the complex
36) Carbon monoxide levels were in excess of 500 parts per million in Lompe's apartment, high levels over 40 ppm were later detected in the neighboring apartment, unit 437, and carbon monoxide was detected in unit 438, as well No alarms sounded anywhere at the Apartments in spite of the high levels of carbon monoxide that morning.
37) Following the incident, Mr. Coryell inspected the furnace and found white, powdery carbon buildup around the outside of the heat exchanger that would have taken some time to accumulate. Carbon buildup takes time to accumulate and indicates improper burn inside the furnace.
38) Mr. Coryell testified that he found that carbon monoxide vent gas was coming backwards out of the draft diverter of the furnace in Lompe's apartment. Under normal circumstances, there should be no flow out of the draft diverter into the room—this indicates a venting problem.
39) A 2012 engineering property evaluation of the Apartments found that multiple furnace exhaust vents were disconnected.

**FINDINGS-Based on Onsite Visit**

40) An inspection of the replaced furnace in the Clubhouse/Office, existing furnaces of the 32 year vintage in several exemplar apartments and the replacement furnace in the apartment formerly occupied by Amber Lompe revealed:
    a) A continuing lack of maintenance and of routine, proactive preventive maintenance inspections.
    b) Examples of lack of maintenance observed during the inspection on site of representative furnaces included, a misaligned burner, burner flame not sitting down, return duct not secured to the furnace cabinet, mineral build up on both a heat exchanger and on the flue pipe, the high speed fan motor (for AC) on one furnace was extremely noisy, indicative of a bad bearing.
    c) All combustion air ducting for all the inspected furnaces and furnace compartments were in violation of the 1973 Uniform Mechanical Code as well as the current 2009 International Building Code, 2009 International Mechanical Code, 2009 International Fuel Gas Code and the 2009 International Fire Code.

7

    d) Two independent sources of combustion air are required for a gas-fired furnace, one at the upper 12-inch level of the furnace compartment and the other at the lower 12-inch level of the compartment.
    e) All Sunridge furnaces have only one, upper level combustion air duct in violation of the codes listed in c) above.
    f) Most of the inspected combustion air duct inlets on the exterior of the building had an air flow check valve (a flapper) that would close if air was drawn in from the outside effectively cutting off the one supply of combustion air for the furnaces in violation of the codes listed in c) above. This would potentially lead to oxygen-starved combustion, which produces high quantities of carbon monoxide gas.
    g) The combustion air ducts and their inlets on the leeward side of the buildings during windy conditions (such as I observed on the day of the inspection) would reverse their air flow and act as a vent rather than as a combustion supply duct.
    h) This reverse flow event would effectively draw air in the furnace compartment from around the exterior of the furnace to flow into the combustion air duct causing the flue gas (containing carbon monoxide) to be drawn backwards through the draft diverter into the furnace compartment and potentially into the heated air circulating in the apartment exposing the tenants to carbon monoxide.

**FINDINGS-Based on review of the applicable codes and statutes at the time of the Amber Lompe caron monoxide poisoning**

41) Wyoming Statute 1977, Title 1. Code of Civil Procedure, Chapter 21. Procedure and Actions, Article 12. Residential Rental Property,§ 1-21-1202. Duties of owners and renters; generally states: "(a) Each owner and his agent renting or leasing a residential rental unit shall maintain that unit in a safe and sanitary condition fit for human habitation. Each residential rental unit shall have operational electrical, heating and plumbing, with hot and cold running water unless otherwise agreed upon in writing by both parties…"

42) And, 1-21-1203 states: " a) To protect the physical health and safety of the renter, each owner shall:

(i) Not rent the residential rental unit unless it is reasonably safe, sanitary and fit for human occupancy;

(ii) Maintain common areas of the residential rental unit in a sanitary and reasonably safe condition;

(iii) Maintain electrical systems, plumbing, heating and hot and cold water; and

8

(iv) Maintain other appliances and facilities as specifically contracted in the rental agreement…"

43) The Sunridge Apartments and its non-code complying heating equipment as detailed above did not constitute a "reasonably safe" set of apartment units for human occupancy as required by the referenced Wyoming Statutes detailing the responsibilities of the Landlord.
44) The City of Casper in the mid 1990's had adopted the set of International Codes now in use throughout the United States. Since the initial adoption of these codes, Casper has adopted the later editions of the codes as they were published in two or three year increments. At the time of Amber Lompe's carbon monoxide poisoning (2011) the 2009 Editions of the International Codes were in effect in Casper, WY.
45) The Scope of the International Building Code (paragraph 101.2) states: "The provisions of this code apply to construction, alteration, movement, enlargement, replacement, equipment, use and occupancy, location, maintenance, removal and demolition of every building or structure or any appurtenances connected or attached to such buildings or structures."
**46)** The Intent of the International Building Code (paragraph 101.3 states: "The purpose of this code is to **establish the minimum requirements to safeguard public health, safety and general welfare…"**
47) The International Code in paragraph 101.4 and its subparagraphs 101.4.1 through 101.4.6 lists the Referenced Codes that are part of the International Building Code. These include by reference The International Fuel Gas Code, The International Mechanical Code and the International Fire Code. Paragraph 101.4 states:" The other codes listed in Sections 101.4.1 through 101.4.6 and referenced elsewhere in this code shall be considered part of the requirements of his code…"
48) The International Mechanical Code per paragraph 101.4.2 "…shall apply to the installation, alterations, repairs and replacement of mechanical systems, including equipment, appliances, fixtures, fittings and/or appurtenances, including…heating, cooling air-conditioning…systems."
49) In the International Mechanical Code, its Chapter 7 dealing with combustion air contains one paragraph 701.1, which in its last sentence refers the user to the International Fuel Gas Code for safe design, and arrangement of combustion air for gas fired appliances.
50) The Inernational Fire Code, similar to the International Building Code has as its Scope:

> **101.2 Scope.** This code establishes regulations affecting or relating to structures, processes, premises and safeguards regarding:
> 1. The hazard of fire and explosion arising from the storage, handling or use of structures, materials or devices;
> 2. Conditions hazardous to life, property or public welfare in the occupancy of structures or premises;

51) And the Intent of the International Fire Code is:

9

> **101.3 Intent.** The purpose of this code is to establish the minimum requirements consistent with nationally recognized good practice for providing a reasonable level of life safety and property protection from the hazards of fire, explosion or dangerous conditions in new and existing buildings, structures and premises and to provide safety to fire fighters and emergency responders during emergency operations.

52) Lastly, the Administrative, operational and maintenance provisions of the International Fire Code are:

> **102.2 Administrative, operational and maintenance provisions.** The administrative, operational and maintenance provisions of this code shall apply to:
> 1. Conditions and operations arising after the adoption of this code.
> 2. Existing conditions and operations.

53) **The Sunridge Apartments and its non code complying heating equipment as detailed above failed to meet the requirements of the above referenced Uniform Mechanical Code, The International Building code, Mechanical Code, Fuel Gas Code and Fire Code which meant that the Sunridge Apartments did not meet the "minimum requirements to safeguard public health, safety and general welfare."**

54) **The International Building Code references the International Mechanical Code, The International Fuel Gas Code and The International Fire Code as part and parcel of the overall requirements of the International Building Code. As discussed above, one of the non code complying issues identified in the case file and via my on site visit were the lack of two sources of combustion air for each furnace compartment in each apartment, that requirements is found in paragraph 304.6 of the International Fuel Gas Code which states:**

> **304.6 Outdoor combustion air.** Outdoor *combustion air* shall be provided through opening(s) to the outdoors in accordance with Section 304.6.1 or 304.6.2. The minimum dimension of air openings shall be not less than 3 inches (76 mm).
>
> **304.6.1 Two-permanent-openings method.** Two permanent openings, one commencing within 12 inches (305 mm) of the top and one commencing within 12 inches (305 mm) of the bottom of the enclosure, shall be provided. The openings shall communicate directly, or by ducts, with the outdoors or spaces that freely communicate with the outdoors.

**This is the same requirement found 40 years ago in the 1973 Uniform Mechanical Code.**

10

55) **Another violation of the International Fuel Gas Code involves Paragraph 304.11(2) which states:**

> 2. Ducts shall terminate in an unobstructed space allowing free movement of *combustion air* to the appliances.

**The presence of air check valves (flappers) on the exterior inlet to most of the combustion air ducts observed during my on site visit violates the requirement for "free movement of combustion air."**

56) **Much of the discussion and list of furnace failures and the conditions of the furnaces found after the failures were further findings of violations of the International Building Code, The Inrernational Fuel gas Code and The International Fire Code. The International Fuel gas Code specifically states:**

VIOLATIONS

**108.1 Unlawful acts.** It shall be unlawful for a person, firm or corporation to erect, construct, alter, repair, remove, demolish or utilize an installation, or cause same to be done, in conflict with or in violation of any of the provisions of this code.

The Fuel Gas Code continues on to emphasize:

**108.7 Unsafe installations.** An installation that is unsafe, constitutes a fire or health hazard, or is otherwise dangerous to human life, as regulated by this code, is hereby declared an unsafe installation. Use of an installation regulated by this code constituting a hazard to health, safety or welfare by reason of inadequate maintenance, dilapidation, fire hazard, disaster, damage or abandonment is hereby declared an unsafe use. Such unsafe installations are hereby declared to be a public nuisance and shall be abated by repair, rehabilitation, demolition or removal.

57) **The International Fire Code also stresses that unsafe heating equipment can not be continued to be operated and that it is unlawful to do so as the risk to occupants is unacceptable**.

> **603.7 Discontinuing operation of unsafe heating appliances.** The *fire code official* is authorized to order that measures be taken to prevent the operation of any existing stove, oven, furnace, incinerator, boiler or any other heat-producing device or appliance found to be defective or in violation of code requirements for existing appliances after giving notice to this effect to any *person, owner,* firm or agent or operator in charge of the same. The *fire code official* is authorized to take measures to prevent the operation of any device or appliance without notice when inspection shows the existence of an immediate fire hazard or when imperiling human life. The defective device shall remain withdrawn from service until all necessary repairs or *alterations* have been made.
>
> **603.7.1 Unauthorized operation.** It shall be a violation of this code for any *person*, user, firm or agent to continue the utilization of any device or appliance (the operation of which has been discontinued or ordered discontinued in accordance with Section 603.7) unless written authority to resume operation is given by the *fire code official*. Removing or breaking the means by which operation of the device is prevented shall be a violation of this code.

**OPINIONS & CONCLUSIONS**

Based on my review of the case file supplied by Mr. Logan and my on site inspection of the Sunridge Apartments in Casper, WY, I hold the following opinions and conclusions to a reasonable degree of fire engineering and fire science probability based on my education, past employment experience, and professional training as a Registered Professional Fire Protection Engineer.

A) Sunridge Partners and AMC knowingly kept an aged, unsafe fleet of non code complying furnaces in violation of The International Building Code, International Mechanical Code, International Fuel gas Code and the International Fire Code in operation at the Sunridge Apartments placing their tenants at risk for carbon monoxide poisoning and fire in spite of warnings/advice from outside consultants and day by day failure of various furnaces after Sunridge Partners took ownership of the property and AMC managed the day to day operations of the apartment complex.

B) The decision by Sunridge Partners and AMC to keep an aged, unsafe fleet of non code complying furnaces in operation at the Sunridge Apartments in

12

spite of recommendations from Land America without utilizing the services of a trained, certified professional to inspect and verify the true physical conditions of each and every furnace constituted reckless behavior on the part of both Sunridge Partners and AMC.

C) If a trained, certified professional had inspected each and every furnace and found the conditions listed in my discussion of my onsite inspection and had found (if the inspections were done at the time Sunrdige Partners and AMC took over the apartments) the conditions that led to the detailed failures and carbon monoxide exposures detailed in 32 above, they would have been required under the referenced codes to red tag (take out of service) many of the non code complying furnaces, correct the combustion air supply deficiencies and call for replacement of the entire fleet of furnaces as the non code compliances constituted an imminent danger to the tenants.

D) The decision by Sunridge Partners and AMC to keep an aged, unsafe fleet of non code complying furnaces in operation at the Sunridge Apartments, Sunridge Partners and AMC failed as landlords to meet their primary obligation under the Wyoming Statutes of providing a safe, code complying building and environment for its tenants.

E) The decision by Sunridge Partners and AMC to keep an aged, unsafe fleet of non code complying furnaces in operation at the Sunridge Apartments, Sunridge Partners and AMC failed to meet the "minimum requirements to safeguard public health, safety and general welfare" found in the International Building, International Fire Code and other referenced codes detailed above.

F) Sunridge Partners and AMC used untrained staff to infrequently maintain the furnaces at the Sunridge Apartment complex and did not act on several occasions to hire a trained professional to due periodic, scheduled preventive maintenance that would have identified the failures of the furnace before they exposed a tenant to carbon monoxide or fire thus leaving all the tenants at risk.

G) The lack of two independent code complying combustion air ducts for each furnace compartment combined with air check valves (flappers) on the combustion air inlet created a recurring oxygen starved combustion process for the furnace, producing large quantities of carbon monoxide.

H) If the flue venting for any furnace was compromised (blocked, obstructed, occluded) the flue gas with excess carbon monoxide would spill/leak into the individual apartments exposing the tenants to carbon monoxide poisoning.

I) And, on windy days, the combustion air inlets on the leeward side of the building would reverse their air flow and act as an air vent/flue turning the air pressure in the furnace compartment negative and causing the flue gas with carbon monoxide to be drawn backwards through the draft diverter into the furnace compartment, producing a sizeable source of carbon monoxide to be potentially drawn into the heated air supply for the furnace, thus being circulated throughout the apartment exposing the tenants to carbon monoxide.

J) As noted in 38 above, reverse air flow through the draft diverter was found for Amber Lompe's furnace immediately after her poisoning by carbon monoxide. This was indicative of either a blocked flue or of the reverse airflow described in I) above.

K) The cracked heat exchangers that were found on several furnaces after the events listed in 31 & 32 above occurred were clear warnings that the useful safe life of those furnaces and the entire fleet had been reached and that the furnaces should have been replaced not on a piece meal basis after an individual failure but in their entirety BEFORE a failure occurred eliminating risk to the tenants.

L) Beyond replacing the entire fleet of furnaces now, the combustion air supply ducts need to have a second duct run to the lower 12 inches of each furnace compartment and the air check valves (flappers) removed from the combustion air duct inlets on the exterior of the buildings and this needs to be done immediately.

*[signature]*

**Michael J. Slifka, PE***
***Registered Professional Fire Protection Engineer**
 **State of California, (FP 479)**