1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF WYOMING

3     ------------------------------------------------------------

4     AMBER NICOLE LOMPE,                  Case No. 12-CV-00088-J

5           Plaintiff,                     Volume XV(a) of XV
                                           (Pages 2202 through 2308)
6           vs.                            Cheyenne, Wyoming
                                           December 20, 2013
7     SUNRIDGE PARTNERS, LLC; and          9:41 a.m.
      APARTMENT MANAGEMENT
8     CONSULTANTS, LLC,

9           Defendants.                    **CERTIFIED COPY**

10    ------------------------------------------------------------

11

12                  TRANSCRIPT OF TRIAL PROCEEDINGS

13            BEFORE THE HONORABLE ALAN B. JOHNSON
                 UNITED STATES DISTRICT JUDGE
14                   and a jury of eight

15

16    APPEARANCES:

17    For the Plaintiff:        MR. TYSON LOGAN
                                Attorney at Law
18                              THE SPENCE LAW FIRM
                                P.O. Box 548
19                              Jackson, WY 83001-0548

20    For the Defendants:       MR. PETER S. DUSBABEK
                                Attorney at Law
21                              MONTGOMERY KOLODNY AMATUZIO & DUSBABEK
                                2625 Redwing Road, Suite 200
22                              Fort Collins, CO 80526

23

24

25            OFFICIAL COURT REPORTER - (307)778-0078

      Proceedings recorded by mechanical stenography,
      transcript produced by computer.

12-CV-00088-J                                          XV(a) - 2203

```
 1    APPEARANCES:  (Cont.)

 2    For the Defendants:      MR. MAX K. JONES
                               Attorney at Law
 3                             MONTGOMERY KOLODNY AMATUZIO & DUSBABEK
                               1775 Sherman Street, Suite 2100
 4                             Denver, CO 80203

 5    Court Reporter:          MS. JULIE H. THOMAS, RMR, CRR
                               2120 Capitol Avenue, Room 2228
 6                             Cheyenne, WY 82001
                               (307)778-0078   CA CSR No. 9162
 7

 8                   *       *       *       *       *

 9
                            I N D E X
10

11    JURY INSTRUCTIONS                                  PAGE

12    Punitive Damages Phase - Procedural and           2205
         Jury Instruction Conference
13    Punitive Damages Phase - Instructions of the Court 2288

14

15    OPENING STATEMENTS                                 PAGE

16    Punitive Damages Phase - Mr. Logan                2214
      Punitive Damages Phase - Mr. Jones                2219
17

18
      PLAINTIFF'S WITNESS                                PAGE
19
      PAUL A. RANDLE - PUNITIVE DAMAGES PHASE
20        Direct - Mr. Logan                            2222
          Voir Dire - Mr. Dusbabek                      2224
21        Direct (Resumed) - Mr. Logan                  2226
          Cross - Mr. Dusbabek                          2253
22

23

24

25
```

12-CV-00088-J                                          XV(a) - 2204

1                          I N D E X (Cont.)

2

DEFENDANTS' WITNESS                                          PAGE

3

CANDACE CAPITELLI - PUNITIVE DAMAGES PHASE
4        Direct - Mr. Jones                                 2267
         Cross - Mr. Logan                                  2280
5        Redirect - Mr. Jones                               2287

6

7   PLAINTIFF'S EXHIBITS                                 RECEIVED

8   69                                                      2240

9   70                                                      2227

10

11

12  DEFENDANTS' EXHIBITS                                 RECEIVED

    DDD                                                      2262
13

14

15  CLOSING ARGUMENTS                                       PAGE

16  Punitive Damages Phase - Mr. Logan                      2292
    Punitive Damages Phase - Mr. Jones                      2295
17  Punitive Damages Phase - Mr. Logan                      2302

18

19

20

21

22

23

24

25

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                    XV(a) - 2205

1         (Proceedings resumed 9:41 a.m.,

2         December 20, 2013, outside the presence

3         of the jury.)

4             THE COURT:  Thank you, Counsel.  Why don't we sit

5    down for a few minutes, discuss what we're going to do.  We

6    are in area that is not frequently one that counsel and the

7    Court are involved with.

8             I would propose at this point that we bring the jury

9    in, that each side be allowed to make a brief opening of maybe

10   10 minutes or so to explain to the jury what evidence is going

11   to be offered and what the position of the parties will be in

12   this case, and then we would hear the plaintiff's witnesses,

13   if any, aimed at the various standards for granting punitive

14   damages or affecting punitive damages in this case.  If the

15   defense has witnesses it wishes to produce, we'll hear them,

16   set aside a brief period for a closing statement, instruct the

17   jury, and furnish a verdict form upon which the jury can

18   record their decision in this case.  Anybody have any

19   different ideas?

20            MR. LOGAN:  No, Your Honor.

21            MR. DUSBABEK:  No, Your Honor.  I -- we might want to

22   discuss the procedure.  I do have one objection to some

23   opinion evidence we got last night at 10:30, but I'll reserve

24   that until the procedure issue is resolved.

25            THE COURT:  All right.


Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                          XV(a) - 2206

1        MR. LOGAN:  Your Honor, the one question that I have

2   is with respect to the jury instruction.  We previously

3   submitted the pattern instruction on phase two which is part

4   of the Wyoming civil pattern jury instructions from Campen,

5   and Shirley I think is the other case that's cited.

6        I do want to raise an issue that we did not propose

7   an additional instruction on burden of proof or the evidence,

8   and I want to make sure that the jury -- I don't know if the

9   Court's had a chance to review, but I want to make sure that

10  we have that right.  And I am working to make sure I can get

11  that language, but I think that there is a important issue

12  that the jury understands what needs to be proved by the

13  plaintiff.

14        And then I also think that the parties need to look

15  at a verdict form which I think would be two questions of the

16  amount of punitive damages that are assessed as against

17  Sunridge and the same question as against AMC.  But I

18  apologize, I did not previously submit a proposed verdict

19  form, and so I just wanted to make sure that we all have those

20  issues resolved before we get going.

21        And I think that probably there's -- that's about the

22  extent of the instructions, and so we should be able to get

23  going fairly quickly.

24        THE COURT:  I think the pattern instruction needs to

25  be modified to some extent because there were factors in that

12-CV-00088-J                                           XV(a) - 2207

 1   pattern instruction that don't seem to apply to this case.

 2           MR. LOGAN:  I agree, and I've talked with defense

 3   counsel about factors 6 and 7 from the pattern instruction,

 4   and the reason that we had submitted a proposed instruction

 5   eliminating those two factors is I don't think there's

 6   evidence regarding those two aspects, but I believe the first

 7   five factors in the pattern instruction are appropriate and

 8   should be instructed pursuant to the pattern.

 9           THE COURT:  And I think we have a verdict form as

10   well that we'll give to the -- give to you to look -- we'll be

11   interested in receiving yours as well, as well as any provided

12   by the defense.

13           MR. DUSBABEK:  May I, Your Honor?  In speaking with

14   or communicating with Mr. Logan, I understand that plaintiff

15   intends to call the economist Dr. Randle.  And we received for

16   the first time last night about 10:24 two spreadsheets of

17   financial information and data and compilation apparently

18   prepared by or at the direction of Dr. Randle, and presumably

19   he's going to testify about all these things.  We did disclose

20   the financials on November 19, and this -- very difficult to

21   prepare a rebuttal when you get something at 10:24 the evening

22   before, and so I'd object to Dr. Randle offering evidence on

23   these things for late disclosure.  And to the extent the Court

24   is not inclined to sustain that objection, I think his

25   testimony should be strictly limited to simply the financials

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J                                        XV(a) - 2208

1    that were provided but not give opinion evidence about what

2    one defendant might be able to pay and what another defendant

3    might be able to pay since that's really the province of the

4    jury after they get the data.  And, of course, I don't know

5    that he's going to say that because I don't have any disclosed

6    opinions about it.  So that would be my objection at this

7    time, Your Honor.

8              MR. LOGAN:  Your Honor, plaintiff designated

9    Dr. Randle in her amended witness list filed on November 25th,

10   2013, and specifically plaintiff designated that Dr. Randle

11   will also be asked to testify regarding the financial

12   condition and assets of AMC and Sunridge related to the

13   plaintiff's punitive damages claims.

14             The Court ordered at the final pretrial hearing the

15   defendants to produce their tax returns and financial

16   statements to the plaintiff.  Dr. Randle has reviewed those

17   financial documents, and the disclosure that we made last

18   night to the defendants was two summary sheets, one for each

19   defendant, summarizing Dr. Randle's analysis of all of the

20   financial documents that he has reviewed.  They are not

21   opinions.  They are simply summary analyses of what all of the

22   tax returns and financial statements show.  In particular,

23   Dr. Randle summarizes -- they're each one-page charts, and

24   Dr. Randle summarizes the income and partners' shares of

25   income from 2005 through 2012 for AMC.  This is simply a way

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                          XV(a) - 2209

1    to digest years and years of tax returns and financial

2    statements and is the -- a visual summary of Dr. Randle's

3    analysis of this financial information.  There's no opinion

4    involved.  It's simply his analysis of what the documents

5    themselves show.

6          As to any opinion of how much should be paid, I'm not

7    going to elicit that kind of testimony from Dr. Randle.  And

8    so I think the defendants' concerns in that regard should be

9    alleviated.  I intend to offer the charts that we disclosed

10   last night as appropriate summary evidence pursuant to

11   Rule 1006.  And if it is objected to, Your Honor, I suppose

12   that I could admit all of the defendants' tax returns and

13   financial statements.  I think that that begs for a lot of

14   problems in the jury room, and either way the testimony about

15   Dr. Randle's analysis of the financial condition of the

16   defendants will be the same.  And those -- that testimony in

17   particular was designated, and so I don't think

18   we're -- there's any concern as to prejudice.  The defendants

19   themselves know their own financial condition, and they've

20   known it for a lot longer than the plaintiff has.

21         The other thing that I wanted to raise with the Court

22   is that if I remember anything from law school, Your Honor, I

23   think that we are required to prove the essential elements of

24   punitive damages by clear and convincing evidence, and I think

25   that --


Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                          XV(a) - 2210

1            THE COURT:  I don't -- I'm not sure that's so.

2            MR. LOGAN:  I want to make sure I'm not wrong on

3    that.  And so I just want to raise that as an issue so that

4    I'm not wishing I had said something earlier, but I want to

5    seek the Court's guidance and defense counsel's guidance on

6    whether there is any additional instruction or there is a

7    burden that I'm missing so that I'm not having gone to the

8    jury without advised them appropriately.

9            THE COURT:  Are you having anybody work on that

10   because you're going to be doing something else?

11           MR. LOGAN:  Yes, Your Honor.

12           THE COURT:  All right.  At any rate, Campen talks

13   about a preponderance.  But I agree with you, the exposure I

14   had in law school suggested the higher standard.

15           MR. LOGAN:  Yes.  In other jurisdictions I think that

16   has been discussed, and Campen is clearly the law in Wyoming,

17   and the state law as to punitive damages clearly applies in

18   this diversity case.  And so I will cite for the record the

19   Campen language, and I guess the question is whether the jury

20   needs to be instructed -- and procedurally I think the

21   question is the jury has been instructed in phase one as to

22   the burden of proof, and will the jury, Your Honor, still have

23   the instructions from phase one when they go back to

24   deliberate in phase two as to the burden of proof?  And if so,

25   I think we've already met that issue or dealt with it.

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J                                          XV(a) - 2211

1          THE COURT:  I would propose that there be a, either a

2   reiteration of the burden of proof standard -- that there be a

3   reiteration of the burden of proof standard that was given in

4   the first group of instructions.

5          MR. JONES:  Your Honor, may I address?  It would

6   appear that the burden issue really goes to whether or not the

7   jury -- whether or not plaintiff proved by its burden that the

8   punitive damages should be awarded.  The jury has already said

9   yes.  This is basically just to determine how much they want

10  to award.  So I'm not so sure this burden really applies at

11  this stage.

12         MR. LOGAN:  And, and this is what happens.  I

13  got -- I've lost my cocounsel, and I'm, I'm

14  wanting -- probably thinking or speaking before I think

15  enough.  But the fact is that the pattern instruction

16  specifically deals with the burden of proof within the

17  instruction itself, which is Pattern Instruction 4.06 which

18  the plaintiff has submitted, and the instruction states:

19  Punitive damages can be properly awarded against defendant

20  because of the action of, uh -- strike that.  Now I'm

21  wandering off course.  But the -- here's where I was trying to

22  go with this.  The jury was instructed in the phase one

23  instructions as to the preponderance that is required to find

24  that the defendant was guilty of willful and wanton

25  misconduct.

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                      XV(a) - 2212

1              THE COURT:  Correct.

2              MR. LOGAN:  And that instruction is appropriate, and

3      that's Instruction 4.06.  So in terms of the burden of proof,

4      we have already instructed the jury as to this finding, and I

5      think that what the plaintiff would propose is that

6      Instruction 4.06 perhaps would be left in or they could, they

7      could still have that instruction along with the phase two

8      instruction, if any discussion of --

9              THE COURT:  I think you would modify it because I

10     don't think there's any affirmative defense, for example.

11             MR. JONES:  Yeah, I mean, it's already been

12     determined.

13             MR. LOGAN:  Right.

14             MR. JONES:  The burden, according to the jury, the

15     burden was done, and I think that the instruction they are

16     going to get now is:  Having determined punitive damages

17     should be imposed for the purposes of punishment and

18     deterrence, you must now determine the amount of the punitive

19     damage award.

20             That's where we're at, and I don't really think any

21     burden or rereading of an instruction concerning burden really

22     applies at this point.

23             MR. LOGAN:  I think that's right.  They've been

24     instructed, and so the question is do they get the phase one

25     instructions again, and is there any reason to interject all

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                              XV(a) - 2213

1    that information back on them?  They've already done their

2    job.

3              THE COURT:  I see no reason to.

4              MR. LOGAN:  So with that, Your Honor, the plaintiff

5    would propose that the phase two instruction be given, that we

6    draft a verdict form with two questions, and we proceed.

7              THE COURT:  Very well.

8              MR. JONES:  Agreed.

9              THE COURT:  Thank you.  Do you think you can make

10   your openings ten minutes apiece?

11             MR. LOGAN:  Yes.

12             THE COURT:  All right.  Let's -- ready to go?

13             MR. DUSBABEK:  Is the Court going to rule on the

14   objection to Dr. Randle?

15             THE COURT:  Provided his testimony is confined to no

16   opinions as to the amount of punitive damages that should be

17   awarded in this case, I will permit him to testify to his

18   summary because it will assist the jury.

19             MR. LOGAN:  I know that we need to take a short break

20   before we call our first witness.

21             THE COURT:  Correct.

22             MR. LOGAN:  Is the Court's plan to do the openings

23   and then take a brief recess?

24             THE COURT:  Exactly.

25             MR. LOGAN:  Thank you, Your Honor.

Julie H. Thomas, RMR, CRR                              (307)778-0078

12-CV-00088-J         Plaintiff's Opening         XV(a) - 2214

1           THE COURT:  Let's bring the jury in.

2       (Jury in at 10:00 a.m.)

3           THE COURT:  Please be seated, ladies and gentlemen.

4           We're here for the second phase of the case that

5    resulted from the -- that results from the answers to the

6    interrogatories that were proposed to the jury and the verdict

7    that was received by the Court yesterday.  We will commence

8    with brief opening statements by each of the parties.

9           Mr. Logan.

10          MR. LOGAN:  Good morning.

11          JURORS:  Good morning.

12          MR. LOGAN:  I'm feeling kind of lonely at my table,

13   and that makes this even scarier for me.  We had a reminder

14   yesterday that life goes on even outside of this courtroom,

15   and Bryan is with his family today, but he's here with us, and

16   I know that.  He left me a little note:  "We have to trust the

17   jury."  And so on we go.

18          THE REPORTER:  Counsel, would you mind moving the

19   podium over?

20          MR. LOGAN:  I've started losing my voice over the

21   last few weeks, or maybe I just get softer.

22          So I told you when we first met that you are going to

23   have an opportunity to do something very important.  And

24   you've been instructed by the Court that what you did

25   yesterday was to compensate Amber, to make up for what she has

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Plaintiff's Opening          XV(a) - 2215

1   lost, to help her, to fix what you can.  And we respect and

2   honor your decision.  That decision is done, and now we're

3   here to discuss what needs to be done to punish and deter the

4   defendants from doing this kind of thing in the future.  Today

5   we are here to talk about something bigger than one

6   20-year-old girl in Wyoming.  We're here to talk about whether

7   this matters.  Punitive damages, you will be instructed, are

8   to deter and to punish the defendants for what they've done

9   and others in the industry, to set a standard for whether or

10  not it's okay to conduct your business like this in Wyoming.

11          So there are a number of things that you'll need to

12  consider, and this is something we talked about the first day

13  that we met.  We're talking about millions of dollars.  Right?

14  And how in the world are we supposed to judge $10 million or

15  $50 million or a hundred million dollars?  What does it all

16  mean?  And the Wyoming law is clear about exactly what you are

17  to consider in making a punitive damage verdict.  Your finding

18  can consider specifically five things, and the Court will

19  instruct on those five things.  And so the reason that we are

20  here today and the evidence that we will present will help you

21  make those five determinations in determining what is the

22  right amount.  It's not just something we dream up and think,

23  oh, that number sounds good.  It's the number that is right,

24  and you will know it's right based on the information that we

25  have provided you.

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Plaintiff's Opening          XV(a) - 2216

1          Now, some of that information you already have, and

2     some of that information you will get today.  So I'm just

3     going to talk to you for a couple of minutes about what you

4     will be allowed to consider and what evidence I will present

5     to you this morning.  And I anticipate that by the time that

6     we are eating lunch you will be starting to make your

7     decision.  This is not going to be another three weeks.  We've

8     spent a long time together, and your job is almost done.  But

9     this job, this last job, is so much more important.

10          So what do you need to know?  The instructions from

11     the Court will tell you that punitive damages should consider

12     the amount of harm that has occurred and the amount -- the

13     kind of harm that was likely to occur, what actually happened.

14     You already know about how dangerous carbon monoxide is.  You

15     know that it can kill.  You know that Amber probably would

16     have been dead within another hour, 90 minutes inside that

17     apartment.

18          You will be instructed that the punitive award should

19     have some relationship, how big of a deal is it that she was

20     hurt, and how bad are her injuries, and it should be related

21     to the severity of the harm that we're talking about.  So you

22     know what your verdict was for Amber, and that's something

23     that you can consider in determining what kind of an award,

24     what kind of damages should be assessed.

25          The degree of reprehensibility of the defendants'

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Plaintiff's Opening          XV(a) - 2217

1    conduct also must be considered, and in that degree of

2    reprehensibility you can consider the duration.  How long has

3    this dangerous conduct gone on?  And I'll talk with you more

4    about that in my closing argument, but you have -- you know

5    the evidence.  In 2007 this property was built -- or was

6    bought, excuse me.  It was built in the '70s.  You know that,

7    too, because those furnaces were built back then.  So how long

8    has this been going on?  Sunridge and AMC took over in 2007.

9    You know about the warnings.  You know about the failures.

10   How long did it go on, and what did they bother to do about

11   it?

12           You can also consider the degree of their awareness

13   of the danger.  Did they know?  What did they know and for how

14   long?

15           You also are to consider whether there has been some

16   sort of cover-up.  Did they know of the danger they were

17   putting their tenants in?  Did they cover it up?  Did they

18   tell people about how much danger they were in?

19           And then what have they done even through today?  And

20   we'll talk a little bit about Mr. Few and the documents that

21   we've never seen and whether they wanted anyone to know the

22   truth about the danger that Amber Lompe was put in.

23           COURTROOM DEPUTY:  Two minutes, Counsel.

24           MR. LOGAN:  You're also to consider the frequency of

25   similar past conduct.  And you might remember that even just

Julie H. Thomas, RMR, CRR                           (307)778-0078

12-CV-00088-J        Plaintiff's Opening        XV(a) - 2218

1   the people that sat on the witness stand, Mr. Few,

2   Mr. Kemberling, and Amber, all within just a couple years had

3   carbon monoxide leaks at the property.  How frequently was

4   this happening?  Was this something that was just a total

5   freak accident?

6           You will be instructed that the financial position of

7   the defendants should be considered because if this is a

8   mom-and-pop operation, a $50 million damage award would be way

9   over the top.  You have to know how much does it take to

10  punish the company to get their attention, what is

11  appropriate.  The punishment has got to fit what has happened.

12  You'll be instructed that if they profited by their choices,

13  that you can take away their profits, that you can cause them

14  to lose money for what they have done.  And you will learn

15  about the millions of dollars that flow in and out of this

16  property, and I'll present evidence through Dr. Randle, our

17  economist who you'll remember, about how much money was being

18  made out there, about the millions of dollars that AMC made,

19  about the millions that Sunridge makes just on this one

20  property.

21          And at the end of the day we'll be back in a similar

22  position where you know more than anyone what has gone on, and

23  you will learn about how much money these companies have made

24  with this kind of conduct.  And I'm going to ask you for a lot

25  of money to punish these companies.  It's not just a number

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Plaintiff's Opening          XV(a) - 2219

1   out of thin air.  We talked about how hard it is to know when

2   we're sitting here what's right.  And you'll know what's right

3   because you can judge how much it will take to actually get

4   the attention of these companies.  You'll get to look at their

5   financial position and see that AMC's income since 2007 is in

6   the neighborhood of $25 million.  You know how they run their

7   business.  Sunridge takes in about a million dollars in rent

8   every year from that one apartment complex.

9            And so at the end of the day today, and I expect that

10  it will not be the end of the day, but at the end of our time

11  together I'm going to ask you to find punitive damages against

12  Sunridge in the amount of $5 million, and I'm going to ask you

13  to find punitive damages against AMC in the amount of

14  $22 million.

15           This is not about Amber anymore.  This is about our

16  communities.  It's about the public.  And I'll talk to you

17  more about how important this is before we leave.  I'm not

18  going to waste any of your time.  We're going to move quickly

19  today, and I know that you'll do what's right.  Thank you.

20           THE COURT:  Mr. Jones.

21           MR. JONES:  Thank you, Your Honor.

22           Good morning.

23           JURORS:  Good morning.

24           MR. JONES:  You, you have spoken.  Yesterday you

25  returned a verdict in the millions of dollars, and that's a

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J        Defendants' Opening        XV(a) - 2220

1   lot of money.  Throughout this trial you've heard a variety of

2   evidence, and you've heard millions of dollars being thrown

3   around a lot.  But remember before you got here, a million

4   dollars, how much money was that?  A lot.

5          This is the stage where you determine how much you

6   want to punish my clients.  This is about sending them a

7   message, Mr. Logan says.  Well, companies -- we hear so often

8   today about companies and profits and money, but companies are

9   made of people.  That's who the companies really are.  They're

10  the employees.  They're the different people you've heard from

11  so far, and you'll hear from Miss Capitelli again today.

12  Because people are who make the decisions, and people are who

13  take the actions and do the things that matter.

14         Now, you've just heard that you are going to hear

15  about the financial situation of AMC, LLC and Sunridge

16  Partners, LLC.  And you know that Sunridge Partners is the two

17  Ctvrtlik brothers, the two brothers that sat here -- one of

18  them sat here every day of this trial.  And AMC, through their

19  regional property manager, Miss Capitelli, who sat here every

20  day of this trial.

21         And what you'll also learn now is that this case has

22  been pending since May 2012.  And you've heard throughout the

23  testimony about experts doing reports, and the information

24  that y'all have, although it may not seem like it was

25  condensed, condensed into these last three weeks, has been

12-CV-00088-J        Defendants' Opening        XV(a) - 2221

1   circulated and discussed for a while during this litigation,

2   and my clients have heard it.  They've learned.  And while in

3   the beginning phase of this trial, the past two and a half

4   weeks or so, it was based on what they knew before February

5   2011, now it's based on what they know now and what is going

6   to happen in the future and what are the people and these

7   companies going to do on a daily basis now.

8          Now, in terms of financials, Mr. Logan mentioned that

9   millions of dollars come in and go out.  We all understand how

10  companies work.  Millions of dollars come in, and millions of

11  dollars go out.  So at the end of the day if you have $15

12  million come in, but you've spent 15 million, where's the

13  profit?  Pay attention to those numbers.  As money comes into

14  a -- Sunridge, what money goes back into it?  And what is the

15  real profits that are actually realized by my clients?  And

16  what impact of a punitive damage award does it do to the

17  public as a whole, the community?  Because the money you award

18  in punitives goes to Miss Lompe and her attorneys.  It doesn't

19  go to a fund set up in the state.  It doesn't go into

20  advertising or any publication.  It goes to Miss Lompe and her

21  attorneys.

22         You have spoken.  My clients have heard you.

23  Mr. Dusbabek and I have heard you.  And we've heard a lot over

24  the course of this case.  I ask that you listen today to the

25  testimony you'll hear, keep in mind what's already -- the

12-CV-00088-J              Randle - Direct              XV(a) - 2222

1   decisions you've already made, and when you get back there to

2   try to figure out how to punish my clients, consider what they

3   actually did, what horrible or reprehensible activity they

4   really did to hurt anybody, and what they do now, and what

5   this has done, and what good maybe this has brought to the

6   future of other tenants and other people.  Thank you.

7            THE COURT:  We'll stand in recess for a few minutes.

8        (Proceedings recessed 10:18 a.m. to 10:38 a.m.,

9        resuming outside the presence of the jury.)

10           THE COURT:  Shall we bring the jury in?

11           MR. LOGAN:  Yes, Your Honor.

12       (Jury in at 10:39 a.m.)

13           THE COURT:  Please be seated, ladies and gentlemen.

14           Members of the jury, you might adjust your screens,

15  take a moment.

16           Would the courtroom deputy please administer the oath

17  to the witness.

18           COURTROOM DEPUTY:  Dr. Randle, if you'll raise your

19  right hand.

20       (The witness was present via videoconference and

21       was sworn.)

22     PAUL A. RANDLE, PLAINTIFF'S WITNESS, DIRECT EXAMINATION

23  Q.  (BY MR. LOGAN)  Good morning, Doctor.

24  A.  Good morning, Mr. Logan.

25  Q.  Can you hear me okay?

12-CV-00088-J          Randle - Direct          XV(a) - 2223

1  A.  I can hear you.  I can't see you.

2  Q.  Okay.  Well, I don't look very good.  It's been a long

3  three weeks.  I just want to make sure that the microphones

4  are going to be okay here because we're getting some feedback,

5  but that seems to be okay.  You can hear me okay, Doctor?

6  A.  Yes, and I can now see you.

7  Q.  Oh, thank you.

8          Can you please describe for the jury what I have

9  asked you to do today, or what are we here to talk about

10  today?

11  A.  You asked me to determine the income, the profitability,

12  of two business entities, Sunridge Partners, LLC, that's a

13  limited liability company that owns a single asset, a single

14  business in Casper, and that's an apartment building located

15  at 3900 East 12th Street in Casper, and to do the same thing

16  for an apartment management company called Apartment

17  Management Consultants, LLC, I'll refer to that as AMC, and to

18  determine their overall profitability.

19  Q.  Dr. Randle, we talked about your background when you

20  testified earlier in the trial.  Can you describe for us what

21  kind of experience you have in analyzing that kind of data?

22  A.  Well, first, I've been a faculty member at Utah State

23  University and the University of Utah and the University of

24  Illinois teaching finance and financial management, which

25  involves the analysis of very complex financial statements,

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Randle - Voir Dire          XV(a) - 2224

1   but have also been a consultant for almost 40 years, and a

2   good portion of that work has, has dealt with the evaluation

3   of very complex capital expenditure projects -- this apartment

4   building is a capital expenditure project -- and the

5   determination of the profitability of such projects.

6   Q.  Dr. Randle, have you created summaries of the income and

7   partner shares of income for each of the defendants in this

8   case?

9   A.  Yes, both for Sunridge and AMC.

10  Q.  And can you describe for us what those summary charts

11  show?

12          MR. DUSBABEK:  Your Honor --

13          MR. LOGAN:  Just in general.

14          MR. DUSBABEK:  -- may I voir dire the witness

15  briefly?  It's going to be on the scope of AMC's summary

16  chart, and I think we're going to have some discussion on that

17  right now.

18          THE COURT:  All right.

19          MR. DUSBABEK:  Thank you.

20                  VOIR DIRE EXAMINATION

21  Q.  (BY MR. DUSBABEK)  Good morning, Dr. Randle.

22  A.  Good morning.  Tell me who I'm talking to, please.

23  Q.  My name is Pete Dusbabek, one of the counsel for the

24  defendants.

25  A.  Thank you.

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Randle - Voir Dire          XV(a) - 2225

1   Q.  Dr. Randle, you did two spreadsheets for these two

2   entities, Sunridge and AMC; is that correct?

3   A.  Correct.

4   Q.  I would like to ask you a question or two or three about

5   the AMC spreadsheet.

6   A.  Fire away.

7   Q.  You used gross and net income numbers from tax returns to

8   come up with your analysis; is that correct?

9   A.  Correct.

10  Q.  And you did not break out revenue directly attributed to

11  the management of the Sunridge apartment complex; is that

12  correct?

13  A.  I did not.

14  Q.  And so what you have done is included all operations of

15  AMC for all other properties and all activities it may be

16  involved with; is that correct?

17  A.  Correct.  The AMC tax returns don't, don't break down

18  income sources from various apartment projects.

19  Q.  And so you don't know what income AMC may have derived

20  from its operations at Sunridge apartments; is that correct?

21  A.  Well, we could kind of work into it backwards, since the

22  Sunridge tax returns show management fees paid, but I don't

23  know for a fact who was the recipient of those fees, so

24  I -- you know, it becomes kind of speculative.

25  Q.  Okay.  And beyond that speculative nature, you really

12-CV-00088-J          Randle - Direct          XV(a) - 2226

1   haven't done the analysis to see what AMC has derived from the

2   management of the Sunridge Apartments?  Would that be correct?

3   A.  That is correct.

4          MR. DUSBABEK:  Thank you.

5          THE WITNESS:  I'm getting a strange echo and

6   feedback.  I don't know whether that's bothersome to others.

7          COURTROOM DEPUTY:  Is it possible for you to turn

8   your volume down on your end just a little?

9          THE WITNESS:  Let me get the technician to help me.

10  May I do that?

11         COURTROOM DEPUTY:  Yes.

12         THE WITNESS:  All right.  Hold on.

13      (Discussion off the record.)

14         THE WITNESS:  Let me talk and see if I hear the echo.

15  I didn't hear it.  Can you hear me?

16         THE COURT:  Very well.

17         THE WITNESS:  Okay.  I think we've gotten rid of the

18  echo.  Thank you.

19                DIRECT EXAMINATION (Resumed)

20  Q.  (BY MR. LOGAN)  Okay.  Dr. Randle, I want to first ask you

21  about what I have marked as Plaintiff's Exhibit 70, and this

22  is the document that you created titled Sunridge Partners, LLC

23  Summary of Company Income and Partner's Shares of Income 2007

24  through 2012.  Do you have that in front of you?

25  A.  I do.

12-CV-00088-J          Randle - Direct          XV(a) - 2227

1  Q.  Is that an accurate description of the summary of

2  Sunridge's income and the partners' shares of income from 2007

3  through 2012?

4  A.  Yes.  Every item in this table comes directly from

5  Sunridge tax returns.

6       MR. LOGAN:  Your Honor, I'd offer into evidence

7  Plaintiff's Exhibit 70, Sunridge Partners Summary of Company

8  Income.

9       MR. DUSBABEK:  And I'd offer the same objection made

10  earlier.

11       THE COURT:  Overruled.  You may receive the exhibit.

12      (Plaintiff's Exhibit 70 received.)

13       MR. LOGAN:  Your Honor, what I would like to do is

14  publish to the jury individual copies of Exhibit 70 so they

15  can follow along without having to split the screen with

16  Dr. Randle, if that's okay.

17       THE COURT:  You may publish.

18  Q.  (BY MR. LOGAN)  Okay.  Dr. Randle, the jury is just

19  passing out so that they each have one of these sheets.  And

20  there's a lot of numbers on here, and so if we can start with

21  just describe for us what you did to come up with these

22  numbers.

23  A.  Let me explain first the format of the table, may I, so

24  the jury can understand what I've done?

25  Q.  Please do.

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2228

1    A.  There are really three horizontal bands of data here.  The

2    first band starts with gross rents and ends up with adjusted

3    2012 net cash flow.  And, in fact, in that band I have

4    computed the annual net cash flow based on the tax returns

5    generated by this apartment building every year for the years

6    2005 through 2007.

7          The second band, the middle band starting with --

8    Q.  Dr. Randle, let me just interrupt you because -- you're

9    looking at Sunridge; right?

10   A.  I'm looking at Sunridge.

11   Q.  Okay.  And I think you said 2005 through 2007, and I want

12   to be clear about the years.

13   A.  I'm sorry.  I misspoke.  2007 through 2012.

14   Q.  Okay.  And why did you use those years?

15   A.  Those were the only years for which I had tax returns.

16   Q.  Okay.

17   A.  I don't know whether there was income in years prior to

18   2007, and obviously there's some 2013 income, but there is no

19   tax return yet.

20   Q.  Okay.  Thank you.  Go ahead.  So you were describing for

21   us what you've included and how the table is set up.

22   A.  Right.  The -- line 2 in the first band of data is

23   entitled Operating Expenses, Including Depreciation.  Do you

24   see that?  And it has following it a footnote 1.

25   Q.  Okay.

Julie H. Thomas, RMR, CRR                      (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2229

1    A.  All those operating expenses in the tax returns are

2    aggregated together.  They're just one big number.  And the

3    middle band is a breakdown of the annual operating expenses.

4    So that's simply a detail of all of the expenses that are

5    shown in a subschedule of the tax return, insurance, legal and

6    professional fees, interest, repairs, taxes, and so on.  And

7    the total for each year corresponds exactly with the, the

8    operating expenses shown in line 2 of the first set of data.

9          The third band, the very -- right at the bottom of

10   the page, shows the ownership shares of the partners in this

11   entity.

12   Q.  Okay.  Let me --

13   A.  This --

14   Q.  Dr. Randle, I have to admit that you lost me there when

15   you were talking about bands.  So now that I'm looking at --

16   A.  Well, there --

17   Q.  There's three clumps of information, right, on the page,

18   the top --

19   A.  There are three.  You prefer clumps to bands?

20   Q.  It's a terrible word, but when you said bands, I was

21   reading the rows, like row 1, row 2, row 3.

22   A.  Okay.

23   Q.  But when you said bands, you mean the group of 1 through 6

24   at the top is the first band you were talking about?

25   A.  Right, and then there's a double or triple space and then

1   a second set of data starting with Annual Operating Expenses.

2   Q.  Okay.

3   A.  And then a couple of spaces, and then a third set of data

4   entitled Sunridge Partners, LLC Partners and Partnership

5   Shares.  Are we all together?

6   Q.  Yes.

7   A.  It would be useful, I think, to talk about the nature of

8   this business.  An LLC -- LLC is an acronym for a limited

9   liability company.  This is a company that is not, uh, exactly

10  a corporation, but it has -- the partners have limited

11  liability, that is, the only liability that can revert to them

12  is a liability that's related to the company itself, and, and

13  someone can't go against them personally for liabilities

14  that --

15          MR. DUSBABEK:  I'm going to object.  I think we're in

16  a -- objection.  This is legal conclusion.

17          THE COURT:  Sustained.

18  Q.  (BY MR. LOGAN)  Okay.  Let's -- instead of itemizing or

19  discussing any one of these, you've described the operating

20  expenses --

21  A.  Right.

22  Q.  -- and then what do we see at the bottom?  The third --

23  A.  The bottom is the ownership shares of each of the three

24  partners in this business, Robert Ctvrtlik, Jeff Ctvrtlik, and

25  the Margaret Marie Ctvrtlik Trust.  For the first four years

12-CV-00088-J            Randle - Direct            XV(a) - 2231

1   of data, 2007 through 2010, Robert and Jeff each had a

2   48 percent interest in this company, and the Margaret Trust

3   had a 4 percent interest.  I don't know what happened

4   in -- after 2010, but from that point on Robert and Jeff each

5   owned 50 percent, and the Margaret Trust was out of the

6   partnership.

7   Q.  Okay.  So this is the information that we have available.

8   And can you describe for us what a LLC tax return is, and why

9   are they done?

10  A.  An LLC, as I indicated, is a limited liability company.

11  It is taxed as a partnership.  That is, the entity itself, the

12  LLC, pays no taxes.  All of the income from the LLC must be

13  distributed to the owners of the LLC, and those distributions

14  were made in exactly the percentages shown at the bottom of

15  the page.  So if the company, hypothetically, had made

16  $100,000 in one of the years, Robert would have received

17  $48,000 that he had to report in his tax return, Jeff would

18  have received $48,000 that had to be reported in his tax

19  return, and the Margaret Trust would have received only

20  $4,000.  The income must be distributed from the LLC to the

21  partners or the owners of the LLC, where it's then taxed.

22  Q.  Okay.  Dr. Randle, are cash -- we see in line 5 net cash

23  flow?

24  A.  Yes.

25  Q.  Is cash flow the same as profits?

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J              Randle - Direct              XV(a) - 2232

1   A.  Not at all.

2   Q.  Can you help us understand that?

3   A.  Well, there -- the, the only means of measuring the

4   profitability of an asset is to measure the cash which is

5   generated from the asset.  There are, there are some expenses

6   in any company which, while they are perfectly legitimate

7   expenses, don't result in an outflow of cash.  And accountants

8   have an acronym that they use for measuring the -- or for

9   describing the, the cash flow that must be used in measuring

10  the profitability of an investment.  They call it EBITDA,

11  earnings before depreciation, amortization, and taxes.  And

12  that's simply kind of a cute acronym for net cash flow.

13          If you'll look at one of the years, take 2007, this

14  apartment building generated gross rents of $269,869.  All of

15  the perfectly legal deductible expenses that the apartment

16  building incurred were $348,863, but a huge portion of that

17  $348,000 was depreciation -- let me back up.  If we subtract

18  the operating expenses from the gross rents, that says the

19  apartment building sustained a loss of $78,994 in that year, a

20  negative profit.

21  Q.  Okay.

22  A.  But as I started to say a minute ago, a huge portion of

23  the $348,000 in expenses was depreciation expense.

24  Q.  What does that mean?

25  A.  $178,272.

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J            Randle - Direct            XV(a) - 2233

1   Q.  Okay.  And what does that mean?

2   A.  This is a perfectly legitimate tax deductible expense but

3   is a, is a paper write-off.  The, uh -- this building was

4   purchased and would have been depreciated over a 30-year

5   depreciable life, and the $178,000 is simply an amortization

6   of the cost of that asset over a 30-year period of time but is

7   not an outflow of cash.  And so the -- using the accounting

8   acronym that I used, EBITDA, the appropriate measure of cash

9   flow is determined by adding back $178,000 to the net income

10  of $78,900, and the net cash flow in that year then is

11  $99,278.

12          And the same computation was made for every

13  subsequent year.  So the net cash flow, adding back

14  depreciation of $316,000 in 2008, results in a net cash flow

15  of $310,000 even though there was a small operating loss of

16  $6100 in that year.  The net cash flow in year 2009 is

17  $438,444, in 2010 $188,855, in 2011 $262,979.  And then

18  suddenly in 2012 we get a huge net cash flow loss, a negative

19  net cash flow of $471,726.

20  Q.  What's --

21  A.  And when I saw that, an alarm bell went off in my head,

22  and I said I've got to go back and, and figure out why the net

23  cash flow which has been 300, 400, 188,000, 262,000 suddenly

24  is a negative almost half million dollars.  And I, and I had

25  to dig into the individual itemization of expenses that is in

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J            Randle - Direct            XV(a) - 2234

1  the second set of data, the second rows, and discovered that

2  in -- that, that in the Other expenses, look at the next to

3  the last row in the second set of data, the Other expenses had

4  been 41,000, 347,000, 308,000, 328,000, 337,000, and suddenly

5  in 2012 they jumped to $1,173,096.

6          At this point I had to go back -- the principal

7  portion of the tax return doesn't show what Other expenses

8  were, but there is a subschedule in the tax returns that, that

9  is footnoted in footnote 2 at the bottom of the page, and let

10 me just read that footnote.  Other expenses of $1,173,096 for

11 2012 include an unexplained charge of $766,138 for creation

12 of, quote, reserve items, close quote.

13         They, the company, the partnership, wrote off an

14 expense of $766,138 that was not a cash flow, it's kind of

15 like depreciation, but is the creation of a liability

16 recognizing something that they think is going to happen in

17 the future or has already happened.

18 Q.  Dr. Randle --

19 A.  The recognition of a write-off of some kind.

20 Q.  Okay.  And let me just ask you --

21 A.  Uh --

22 Q.  Dr. Randle, have you reviewed --

23 A.  Yes.

24 Q.  -- any evidence of that money actually having been spent?

25 Is there any record of that money going anywhere in the

12-CV-00088-J          Randle - Direct          XV(a) - 2235

1   returns, in the financial documents you've reviewed?

2   A.  There is no money nor has any money gone anyplace.  It's

3   simply the creation of a liability in the company's balance

4   sheet.  Companies do this all the time.

5          Let me explain with some examples.  If, if a company,

6   if a company thinks some of its accounts receivable are going

7   to be written off, the company -- it is perfectly appropriate

8   for the company to reserve for -- to create a reserve for what

9   is called bad debt losses and, and write those -- and create

10   that reserve and, uh, and create the liability in the

11   company's balance sheet, write it off as an expense, even

12   though no cash has left the company's bank account.  Insurance

13   companies routinely create reserves.  If you had an automobile

14   insurance policy with a $1 million, uh, liability portion and

15   you were in a serious automobile accident, your insurance

16   company would immediately reserve $1 million for the possible

17   payment of that loss if an action is brought against you.

18   Q.  Okay.  Dr. Randle --

19   A.  Again, no, no cash has left the company.  It's simply an

20   accounting entry, but it's -- it can be written off as an

21   expense.

22          And so in that year if we add back that noncash

23   expense, just like we added back depreciation expense, the

24   company had a net cash flow of $294,412, which is absolutely

25   consistent with the net cash flow that they were generating in

12-CV-00088-J          Randle - Direct          XV(a) - 2236

1   the previous years.

2   Q.  Okay.  So having looked at that information, how much net

3   cash flow have you found that Sunridge has seen between 2007

4   and the end of 2012?

5   A.  Well, without adding back the, this reserve that I've just

6   explained, their total net cash flow for those one, two,

7   three, four, five, six years would be $828,603.  With the

8   add-back of the reserve write-off, the net cash flow becomes

9   $1,594,741.

10  Q.  Is there a dollar of profit on this sheet from any other

11  place other than the Sunridge apartment complex in Casper?

12  A.  No.

13  Q.  Okay.  I want to turn to the Apartment Management

14  Consultants Summary of Company Income that you have detailed

15  in the table.  Mr. Dusbabek asked you a couple questions about

16  your calculations on this, too, but do you have that table in

17  front of you?

18  A.  I do.

19  Q.  And --

20  A.  What is the exhibit number for that, just so I can keep

21  track of things?

22  Q.  The exhibit number is 69.

23  A.  All right.

24  Q.  What information did you review to create this summary

25  exhibit?

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2237

1      MR. DUSBABEK:  I'm going to object to anything from

2  this witness that relates to finances and income outside of

3  what was derived at Sunridge Apartments.  I don't think that

4  it's relevant to go into other operations and other locales

5  and other clients and that kind of thing, and I think that's

6  exactly what this witness intends to do.

7          Objection:  relevance and Rule 408.

8          THE COURT:  Well, let's approach.

9      (At side bar.)

10          THE COURT:  Go ahead and make your argument.  It's a

11  relevance argument for you.

12          MR. LOGAN:  Your Honor, the Wyoming law on the

13  financial position of the company at issue is clear and their

14  ability to pay a punitive damages award, not one small part of

15  their company.  The question is who is the company defendant

16  here today, and their ability to pay a punitive damage award

17  is the relevant consideration for the jury.  And so the

18  Wyoming law is clear that the evidence about the defendant and

19  their assets and profits, pursuant to Campen and all the other

20  line of cases in Wyoming on punitive damages, allows this

21  testimony.

22          MR. JONES:  Your Honor, if I can respond.  I don't

23  know the exact cite, but it's a State Farm case, and in that

24  case the Wyoming court held that the actions of State Farm in

25  other states and the money that it earned in other states

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2238

1    should not be a consideration for punitive damages and that

2    only the action and the money that occurred from State -- that

3    was derived from State Farm in the state of Wyoming was

4    relevant.

5         MR. LOGAN:  You know, I think that the issue is are

6    there subsidiaries, are there parent companies involved, and

7    sometimes in other jurisdictions there have been concerns

8    about whether the ability of the actual defendant in the

9    courtroom has been considered.  And here we know there is one

10   Apartment Management Consultants, and the Court's instructions

11   have already been set about -- and the jury needs to know what

12   this defendant is able to pay and what their profits and

13   assets and financial condition are.

14        THE REPORTER:  Excuse me.  I can't hear when it's

15   touched.

16        THE COURT:  I will allow you to inquire.  I think the

17   defense is well capable of bringing out on cross-examination

18   their position that it should only be based upon the profits

19   Apartment Management Corporation [sic] is deriving from the

20   operation of the Sunridge Apartments in Casper.  We know that

21   they're operating and managing other apartment complexes as

22   well, even in Wyoming.

23        MR. JONES:  Thank you.

24     (End of side bar.)

25   Q.  (BY MR. LOGAN)  Dr. Randle, we took a quick break.  I had

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2239

1   asked you what information you reviewed that is the basis of

2   the table marked as Plaintiff's Exhibit 69.

3   A.  I had income tax documents for the years 2005 through 2012

4   for this company.  There were two different types of tax

5   returns.

6           AMC was an LLC for the years 2005 and 2006, and so a

7   partnership much like Sunridge.  There were three partners

8   during that, those two years, Greg Wiseman, who held a

9   50 percent interest in the company, Howard Schmidt, who held a

10  25 percent interest, and David Schmidt, who held a 25 percent

11  interest.

12          AMC became a, what is called a subchapter

13  S corporation or a sub S corporation in 2007.  This is a

14  full-fledged corporation just like General Motors except the,

15  the owners of the company elect to have the income treated as

16  personal income rather than corporate income.  So just like

17  the LLC, all of the income in a sub S corporation, with one

18  exception, flows through the sub S corporation without being

19  taxed and goes directly to the partners or the individual

20  shareholders of the corporation where it's -- where it goes

21  into their personal tax returns.

22          Wiseman, Greg Wiseman, was the sole stockholder in

23  this sub S corporation for the years 2007, 2008, 2009.  In

24  2010 his ownership interest decreased from 100 percent to

25  97.69-plus percent, and there were two new, two new

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2240

1    shareholders or partners involved, Heather Newport, who had a

2    1.15-plus percent interest, Brenda Barrett, who had a

3    1.15 percent interest.  In 2012 Mr. Wiseman's ownership share

4    dropped from 97.69 to 94.5, and Ms. Newport and Miss Barrett

5    each, their shares each increased to 2.75 percent.

6    Mr. Wiseman was clearly the, by far and away, the dominant

7    shareholder or partner in this company for the entire period

8    of time that I had records.

9    Q.  Dr. Randle --

10   A.  In addition to those tax returns, I had also AMC financial

11   statements which included income statements, balance sheets,

12   and statements of net worth for all of the years, 2005 through

13   2012.

14           MR. LOGAN:  Dr. Randle, you know, it's really hard

15   for me to interrupt you when you're in Salt Lake.  So that the

16   jury can follow you, I'm going to offer into evidence

17   Plaintiff's Exhibit 69.  They don't -- they haven't seen this

18   yet, so before we get too far along, let me offer Plaintiff's

19   Exhibit 69.

20           THE WITNESS:  All right.

21           MR. DUSBABEK:  We would renew our objection, Your

22   Honor.

23           THE COURT:  You may have a continuing objection.  It

24   is received.

25       (Plaintiff's Exhibit 69 received.)


Julie H. Thomas, RMR, CRR                        (307)778-0078

1    MR. LOGAN:  May I publish individual copies to the

2    jury, Your Honor?

3    THE COURT:  Yes, you may.

4    Q.  (BY MR. LOGAN)  So Dr. Randle, the jury has just received

5    the chart, so we all have it in front of us now.  Can you

6    describe for us how this table is laid out?  Is it similar to

7    the table in Exhibit 70 that we already looked at?

8    A.  Well, in the interest of keeping things as simple as I

9    could, I crammed a lot of information into this page.  The

10   first two lines are, uh, possibly the most important in that

11   they show the gross receipts.  Most companies would call this

12   sales, but these people weren't selling anything.  These are

13   receipts for services rendered which were $2.3 million in 2005

14   and grew every single year for these years until they grossed

15   $16,036,377 in 2012.  This company is incredibly profitable.

16   I haven't shown any of the expenses, but the net income, the

17   portion that's left after operating expenses that needs to be

18   distributed to the partners started out as $805,840 in 2005,

19   grew every single year until the net income was $5,745,854 in

20   2012.  There was no net -- no need to do the add-back of

21   depreciation as I did with the Sunridge property simply

22   because there essentially is no depreciation.  There really

23   are very insignificant assets in the company.

24       The next line is what is called net operating margin.

25   That's simply measuring the number of dollars that flow from

12-CV-00088-J          Randle - Direct          XV(a) - 2242

1   gross receipts to net income.  And so the thirty -- in the

2   first year 34.55 percent is $805,000 divided by $2,332,000.

3   They, they brought down to the bottom line 34.55 percent of

4   every dollar of income that came into the company in that

5   year, 23.59 percent the next year, and so on all the way

6   across.  We get to 2012, 34 -- 35.83 percent.  That's a feat

7   that's not replicated by many companies.  A grocery store is

8   able to bring about 5 cents of every sales dollar down to the

9   bottom line.  A jewelry store that sells high-margin stuff

10  might bring down 12 or 15 percent of net sale -- of gross

11  sales to the bottom line.  This company is bringing down last

12  year almost 36 percent of what came in on the front end.

13          The next lines show the distribution of this net

14  income to the partners.  So in 2005 of the $805,840 on line 2,

15  $490,529 went to Mr. Wiseman, $157,590 to Mr. Schmidt, Howard

16  Schmidt, and $157,900 [sic] to Mr. David Schmidt.

17          In the next year we've got to distribute $812,429,

18  and you can see the distribution to the three partners,

19  494,545 to Mr. Wiseman, 158,942 to each of the Schmidts.

20  Q.  And what is the --

21  A.  The next three years --

22  Q.  Thank you.

23  A.  -- the company became an LLC, and Mr. Wiseman was the sole

24  owner in those three years, and he was responsible -- he

25  received $1,431,901 that he had to report in his personal tax

12-CV-00088-J          Randle - Direct          XV(a) - 2243

1   return in that year, 2.8 million plus in 2008, 2.896 million

2   in 2009.

3          In 2010 we added a couple of new partners,

4   Miss Newport and Miss Barrett, but of the $4,365,874 of net

5   income in this company, Mr. Wiseman received $4,265,220, and

6   each of the other two partners $50,327.

7          In the next year the ownership shares changed a

8   little bit.  Mr. Wiseman, of the $3,992,011 of income, took

9   out $3,772,450, and each of the other two partners $109,780.

10  And finally in the last year the income distribution was

11  $5,429,832 to Mr. Wiseman, $158,011 to each of the other two

12  partners.

13         Over the long haul of the 22 million 860 [sic]

14  dollars that was distributed to all of the partners,

15  Mr. Wiseman took out $21,590,710, by far the lion's share of

16  the income.

17         Down below I just made some additional analyses of

18  profitability.  We commonly measure income as a percentage of

19  the total assets of a company as a measure of profitability,

20  and also income as a measure -- as a ratio of equity, the

21  amount the owners have put into the company.  And that's what

22  I've shown below.

23         In year one the, uh, the company had $47,453 in debt

24  and $24,005 in equity.  If I divide the net income of $805,000

25  by, by the total capitalization of $71,458, this company

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2244

1   earned 1,128 percent on total capital and 3,500 -- 3,357

2   dollars [sic] on equity.

3   Q.  Percent, Doctor?

4   A.  You can see those ratios as we go across.  There's one

5   line in there, annual return on equity, where it says DIV/0.

6   That says -- I was attempting to divide by zero.  That's

7   because for some reason in 2009 the company showed zero

8   equity.  There was some kind of a recapitalization and had no,

9   no owner's equity in the business at all, and you can't divide

10  by zero mathematically.

11       In the -- in 2012 the company earned 501 percent on

12  total capital, 596 percent on equity.  I mean, those are,

13  those are rates of return on investment that are just almost

14  beyond comprehension.  I've been doing this stuff for 50

15  years, and I've never seen rates of return on investment that

16  even came close to approaching these levels of profitability.

17  Q.  Dr. Randle, if we look at the net income for AMC, we can

18  see here in the chart you've got 2005 through 2012.  To

19  determine the total net income just for 2007 through 2012,

20  could we do that, and how would we need to do that

21  calculation?

22  A.  Well, the total income for all of the years is

23  $22,860,142, and you want to do it from 2007 on?

24  Q.  Yeah.

25  A.  All we need to do is subtract the first two years of net

12-CV-00088-J          Randle - Direct          XV(a) - 2245

1   income.  Let me do that and explain what I'm doing.  So from

2   22 thousand 860 -- $22,860,142 I'm going to subtract $805,840

3   for 2005 and $812,429 for 2006.  Let me make that computation.

4   May I?

5   Q.  Please.

6   A.  Just so the record is complete, I have subtracted from

7   $22,860,142, I've subtracted $805,840, which is the net income

8   for 2005, and $812,429, which is the net income for 2006, and

9   the remainder is $21,241,873 which would be the net -- the

10  aggregate net income for the years 2007 through 2012.

11  Q.  The only -- the other thing I wanted to ask you about

12  Exhibit 69, Dr. Randle, is about halfway down the page there's

13  a line Additional Officer Compensation.

14  A.  Right.

15  Q.  Can you describe for us what that is?

16  A.  An LLC cannot -- which the company was for 2005 and 2006,

17  cannot deduct any amounts paid to officers of the company as

18  salary.  All of the income has to go directly to the, to the

19  partners' tax returns.  When the company became an LLC [sic]

20  in 2007, it could then pay salaries to officers of the

21  company.

22  Q.  Okay.

23  A.  So in 2007 they paid $169,849, and so on across, $537,211

24  in 2011, $350,002 in 2012.  I can't tell you who received

25  those amounts.  The tax returns don't identify the recipient,

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J              Randle - Direct              XV(a) - 2246

1   although it's probable, given the ownership of the company,

2   that most of it probably went to Mr. Wiseman, but that's

3   speculation on my part, and I'm not allowed to speculate.

4   Q.   Okay.

5   A.   If we add -- however, if we add back the additional

6   compensation paid to officers as a tax deductible expense to

7   the corporation, then the total partner income goes up from

8   21 thousand 590 dollars to -- pardon me, $21,590,000 to 24

9   million 547 [sic] dollars in that five-year -- let's see, one,

10  two, three, four, five -- six-year period of time, the same

11  period of time that corresponds to the computation you asked

12  me to make a minute ago.

13  Q.   Right.   So if we were to look at the total partner income

14  including that compensation to the officers for the 2007

15  through 2012 time period, that would just be the same kind of

16  calculation, $24,547,818 less the 805,000 and the $812,000

17  from '05 and '06?

18  A.   Right.

19  Q.   And can you do that calculation for us, Dr. Randle?

20  A.   I can.

21         Let me explain what I've done so the record is clear.

22  24 thousand [sic] 547 thousand 818 dollars is total partner

23  income for the years 2005 through 2012.   I've subtracted from

24  that $805,709, which is the distribution for 2005, and

25  $812,425, which is the distribution for 2006, and the

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2247

1   difference is $22,929,549.

2   Q.  Dr. Randle --

3   A.  I'm jealous.  I'm in the wrong business.  I should have --

4   Q.  Doctor, the last question I wanted to ask --

5   A.  -- been a property manager.

6   Q.  Sorry.  The last question I wanted to ask you is:  Have

7   you had an opportunity to review an affidavit from Linda Moyer

8   and a expense summary report and case expense summary from

9   The Spence Law Firm related to --

10  A.  Yes, I have all three of them in front of me, Mr. Logan.

11  Q.  And have you reviewed expense summaries like this in the

12  past?

13  A.  Yes.

14          MR. LOGAN:  I'm going to offer into evidence

15  Plaintiff's Exhibit 67, which is the affidavit of Linda Moyer,

16  and Plaintiff's Exhibit 68, which is The Spence Law Firm case

17  expense summary for Lompe case which includes both a detailed

18  expense and a one-page summary at the back.

19          MR. DUSBABEK:  Your Honor, may we approach?

20          THE COURT:  Yes.

21      (At side bar.)

22          MR. JONES:  I'll talk.  Just want to put on the

23  record that we have not been provided any of the

24  documentation, invoices, information to support the costs that

25  are claimed here, but we will agree and stipulate that if

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J            Randle - Direct            XV(a) - 2248

1    Miss Moyer was called to testify that she would testify in

2    accordance with her affidavit as to what the summary is, but

3    we reserve our objections to be able to challenge the summary,

4    challenge the documents that support it, as well as the

5    reasonableness and necessity of those claimed items.

6            MR. LOGAN:  And for the record, Miss Moyer is

7    available to testify by phone if necessary, and we've

8    discussed that off the record, but my understanding is that

9    defense counsel intends to cross-examine Dr. Randle about what

10   he knows about these documents, and I think we'll move

11   forward.

12           MR. DUSBABEK:  Well, I think we need to object --

13           MR. JONES:  Right.

14           MR. DUSBABEK:  -- to the admissibility of this.  I

15   mean, what -- we don't have any of the backup documentation.

16   We would like to reserve a right to move for remitter as

17   needed if and when we get the documentation.

18           THE COURT:  It will be difficult, but I, I understand

19   what you're saying, and I'm assuming that the plaintiff is

20   agreeing to the procedure that has been suggested, that you

21   are reserving opportunity to call later Miss Moyer and

22   interrogate her outside of the presence of the jury and to

23   receive the actual documents.

24           MR. DUSBABEK:  Yeah --

25           MR. JONES:  Correct.

Julie H. Thomas, RMR, CRR                      (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2249

1         MR. DUSBABEK:  -- we also need production of the

2   backup documentation.

3         THE COURT:  That's what I was saying.

4         MR. JONES:  Right.

5         MR. DUSBABEK:  Yeah.

6         MR. LOGAN:  So, Your Honor, the plaintiff's

7   exhibit --

8         THE COURT:  I think whenever there is a summary you

9   have to have present in court the documentation or available

10  to counsel prior to coming to court.

11        MR. LOGAN:  And, and I understand that order or that

12  rule, Your Honor.  The foundational witness is available to

13  testify, and so if the defendants are going to object to the

14  admission of the document, we can perhaps take a quick break

15  after Dr. Randle and sort that out, and I can back up and ask

16  him what he knows, and we can deal with the evidence

17  separately.

18        THE COURT:  All right.  Then perhaps we'll need to

19  transmit all the documents to a location in the area that can

20  be shared with counsel.

21        MR. DUSBABEK:  I doubt if Dr. Randle has seen that

22  backup documentation for this, but I don't know.

23        MR. JONES:  If I understood, Randle will say he's

24  seen the summary but he hasn't seen the doc data.

25        MR. LOGAN:  Right.


Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J              Randle - Direct              XV(a) - 2250

1        MR. JONES:  So he's seen the summary, so okay, so

2  he'll say the number, but that's about all he can say.

3        MR. LOGAN:  I think that's right.

4        MR. JONES:  And then all we were saying is, you know,

5  we don't have any of the documents to look at this to support

6  the summary, and just to assist in speeding it along we would

7  stipulate that if she is called she will say it's in this

8  affidavit which is -- I created this summary based on

9  documents and information.  It's just that we don't have them.

10        MR. LOGAN:  Right.

11        MR. DUSBABEK:  We got this --

12        MR. JONES:  Last night.

13        MR. DUSBABEK:  -- 10:24 p.m. yesterday evening.

14        MR. LOGAN:  I think that what we should do is, if

15  it's okay with the Court, I'll ask a couple additional

16  questions of this witness about what he knows, we will table

17  the issue with the actual evidence.  The objection is noted,

18  and I don't -- are we pending a -- is that objection pending?

19  Has it been ruled on yet?

20        THE COURT:  No, it's been -- they're reserving the

21  opportunity to --

22        MR. LOGAN:  Okay.

23        THE COURT:  -- at a later time question --

24        MR. LOGAN:  Okay.

25        THE COURT:  -- the witness who prepared this and to

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2251

1  observe the documentation in support of it.

2          MR. LOGAN:  Right.  Okay.

3          THE COURT:  And if I rule in favor of it, we deduct

4  it from the expense --

5          MR. DUSBABEK:  I'm sorry.  We --

6          THE COURT:  -- in an amount equal to that expense,

7  whatever it might be.

8          MR. LOGAN:  All right.

9          MR. DUSBABEK:  I don't think it should be admitted

10 unless -- but --

11         MR. LOGAN:  And I think the point is that I think

12 that we are not going to admit it through this witness, and

13 that alleviates your concern.  I'm going to ask him what he's

14 reviewed in his work, and you can cross-examine him about what

15 he has reviewed, and we'll then decide whether we're going to

16 call the other witness.

17         MR. DUSBABEK:  I don't know what the relevance would

18 be of Dr. Randle to say he reviewed this thing if it's not

19 going to come in.  I assume he can't testify about its

20 contents.  He hasn't seen the documentation.  I mean, I don't

21 think there's the foundation for it.

22         MR. JONES:  I guess -- he's an economist.  Right?

23         MR. LOGAN:  Right.

24         MR. JONES:  That's what he's been disclosed as.  So

25 him commenting as to what your account manager says are costs

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Randle - Direct          XV(a) - 2252

1   doesn't seem to -- his role as an economist doesn't seem to be

2   furthered by him testifying as to this, it doesn't help the

3   jury, as to actual facts or statements.

4          MR. LOGAN:  Well, it's information he has reviewed in

5   the case, and he can comment that these expense reports

6   are -- that he looks at documents like this and what it is.

7          THE COURT:  His problem is I'm not sure he's reviewed

8   the backup material under the federal statute.  What is it,

9   1294, whatever it is, sets those expenses that can be

10  recovered in a case in the absence of explicit statute.

11         MR. JONES:  And we also previously objected because

12  Mr. Randle was not disclosed as an expert to provide opinion

13  testimony.  He was just going to provide information as to

14  what the financials of a company said.  Now he is going to be

15  offering opinion as to reasonableness and necessary of these

16  bills.  No?

17         MR. LOGAN:  Not opinion testimony.  Just what they

18  are.

19         MR. DUSBABEK:  I just question the relevance of it.

20         MR. LOGAN:  The relevance is that the costs of

21  litigation are something that the jury needs to consider in a

22  punitive damage award.

23         MR. JONES:  He may not have a foundation.  He just

24  has a summary.

25         THE COURT:  I'll sustain the objection if

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J                Randle - Cross              XV(a) - 2253

1   that's -- if we can't agree on that, what you have suggested.

2          MR. LOGAN:  Okay.  So I think that I will -- I'm not

3   going to have any additional questions for the witness, and

4   what I would ask is that at the conclusion of this witness, I

5   mean, maybe it's going to be lunchtime anyway, but if I could

6   have a quick recess so that I could prepare my foundational

7   witness, and perhaps over that break I can work on the state

8   of her files, and maybe we can work it out with counsel.

9          THE COURT:  Very well.

10          MR. LOGAN:  Okay.  Thank you, Your Honor.

11      (End of side bar.)

12          MR. LOGAN:  Dr. Randle, those are all the questions I

13   have for you.  Thank you.

14          THE WITNESS:  Thank you, Mr. Logan.

15          THE COURT:  Mr. Dusbabek.

16          MR. DUSBABEK:  Thank you.

17                     CROSS-EXAMINATION

18   Q.  (BY MR. DUSBABEK)  Good morning, Dr. Randle.  It's Pete

19   Dusbabek again.

20   A.  Good morning.

21   Q.  I want to start with some questions regarding Plaintiff's

22   Exhibit 70.  Would you happen to have that in front of you?

23   A.  Sunridge?

24   Q.  Right.  And, well, if you look at, if you look at the

25   gross rents, your column number 1, do you see that?


Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J                Randle - Cross              XV(a) - 2254

1   A.   Yes.

2   Q.   If you go to the right, and the far right number is

3   5,591,787 [sic].

4   A.   Right.   Right.

5   Q.   So that would be from 2007 through 2012 inclusive; is that

6   correct?

7   A.   Correct.

8   Q.   And then if we just go down that right-hand column, you've

9   got the total operating expenses including depreciation, do

10  you not?

11  A.   Right.

12  Q.   And so that is $5,951,404.  Do you see that?

13  A.   Correct.

14  Q.   And so the, the actual net operating income including

15  depreciation for the relevant time period is a loss of

16  $360,017; is that correct?

17  A.   Exactly.

18  Q.   And depreciation is, in fact, a legitimate recognized

19  business expense in your field, is it not?

20  A.   Absolutely.

21  Q.   And what it means is that the value of the real property

22  is actually decreased; is that not correct?

23  A.   No.   It's a write-off of the cost of that property, but

24  it's probable in an investment like this that the asset is

25  actually increasing in value.


Julie H. Thomas, RMR, CRR                              (307)778-0078

12-CV-00088-J            Randle - Cross            XV(a) - 2255

1  Q.  Well, does this not take in account wear and tear and the

2  kinds of things that go on over time with real and personal

3  property that's being depreciated?

4  A.  Sure.  Yes.

5  Q.  And so what you did to come up with some kind of a net

6  cash flow number is you went down to line 4 and you added back

7  in the depreciation; is that not correct?

8  A.  Exactly.

9  Q.  So that's how you got a net cash flow of 828,603 for the

10  entire time period?

11  A.  Exactly.

12  Q.  Now, if we look in 2012, you see a -- I'm looking at line

13  3, and I'm under the column 2012, it has $598,775.  That's

14  actually an operating loss, is it not?

15  A.  For 2012, right, that includes the, the big creation of

16  the reserve, $766,000.

17  Q.  And I take it you don't know whether or not monies were

18  actually invested back into the property in that year.  Would

19  that be fair?

20  A.  I don't know.  If they were, that wouldn't be a reserve.

21  Q.  It would be a capital expenditure?

22  A.  It would be a capital expenditure, which would not show up

23  in the income statement at all.

24  Q.  In any event, you -- for 2012 then you put back in

25  $127,049 of depreciation; is that right?

12-CV-00088-J            Randle - Cross            XV(a) - 2256

1   A.  Correct.  Right.

2   Q.  And that came out with a net operating loss of $471,726;

3   is that correct?

4   A.  Correct.

5   Q.  Now, have you seen the balance sheet for Sunridge Partners

6   as part of the materials you reviewed?

7   A.  I received no financial statements for Sunridge Partners.

8   Q.  Let me -- I'm going to show you what is part of

9   Plaintiff's Exhibit 48, and let's see if you can see this

10  document.  And what I'm showing you is -- has a Bates number

11  of SP AMC 1149.

12          THE COURT:  We'd have to fax it to him, I think, for

13  him to see it.

14          MR. DUSBABEK:  I'm sorry?  Well, maybe we'll have to

15  do that over the noon hour, Your Honor, but I would like to

16  inquire about this.

17          COURTROOM DEPUTY:  I can allow him to see it, but I

18  don't know if it's been admitted.

19          THE WITNESS:  I'm not seeing any document.  It's not

20  on the screen.

21          COURTROOM DEPUTY:  I have to mute their screens.

22          MR. DUSBABEK:  One moment, Dr. Randle.

23          Okay.

24          COURTROOM DEPUTY:  There.

25  Q.  (BY MR. DUSBABEK)  Can you see that, Doctor?

12-CV-00088-J          Randle - Cross          XV(a) - 2257

1    A.  A portion of it.  I'm not seeing the entire form.

2    Q.  Well, it's going to be very small print, and I'll try to

3    direct you here.

4    A.  All right.

5    Q.  I'll zoom in.  Do you see this Sunridge Apartments balance

6    sheet?

7    A.  What I'm seeing is Sunridge Apartments and the portion of

8    the line balance sheet prior month comparable, or something,

9    as of 9/30/2013.  That's all I'm seeing.

10   Q.  And you've not seen that before, Doctor?

11   A.  I have not seen that before.

12   Q.  Okay.

13        MR. DUSBABEK:  I think I'm going to move on.  What

14   I'm going to ask to do is to fax this to the witness perhaps

15   over the noon hour.

16   Q.  (BY MR. DUSBABEK)  Dr. Randle, are you available, say,

17   after 1 p.m. mountain time?

18   A.  I learned a long time ago when I'm in court testifying, I

19   better be available.

20   Q.  So I take it the answer would be yes.

21   A.  Yes.

22   Q.  Okay.  Now I've got some questions about AMC, Dr. Randle.

23   A.  All right.  All right.

24   Q.  I'm looking at your Exhibit 69.

25   A.  I have it.


Julie H. Thomas, RMR, CRR                        (307)778-0078

1  Q.  And you've got -- you didn't include the expenses of the
2  operation in this sheet, did you, sir?
3  A.  No, I just included the gross receipts and the net income.
4  Q.  And the gross receipts would be for the company's entire
5  operation, would it not?
6  A.  Correct.
7  Q.  You know that the company operates in a number of
8  different states?
9  A.  I don't know that.  I know they -- the only evidence I've
10  seen is Utah and Wyoming, but I suspect there are other
11  states.  I don't know that for a fact.
12  Q.  And you, you haven't attempted to address or analyze what
13  type of revenue and/or net income AMC derived from managing
14  the Sunridge Apartments; is that correct?
15  A.  I've seen no, no information that would have allowed me to
16  do that.
17  Q.  And you've not analyzed what AMC may have derived in terms
18  of gross or net income within the state of Wyoming.  Would
19  that be correct?
20  A.  That is correct.
21  Q.  And you would have no way to decipher those types of
22  numbers from what you reviewed; is that correct?
23  A.  There was nothing in either the tax returns or the AMC tax
24  returns or balance sheets or income statements that was broken
25  down like that.

12-CV-00088-J            Randle - Cross            XV(a) - 2259

1    Q.   And I take it that you did not have access to the

2    management contract or contracts involving AMC's management of

3    Sunridge Apartments.  Would that be correct?

4    A.   It is correct, I did not have that information.

5    Q.   Do you know how many employees Apartment Management

6    Consultants has?

7    A.   No.

8    Q.   Do you know how many different apartment facilities AMC

9    manages?

10   A.   No.

11   Q.   Let me turn your attention to Exhibit 69.

12   A.   All right.

13   Q.   And you were talking about the -- I think you mentioned

14   that the company has what you call insignificant assets.  Did

15   I quote you correctly?

16   A.   Relative to the income they are producing, that's correct.

17   Q.   And you've noted that on Exhibit 69 in the column for Net

18   Worth Partner's Equity?

19   A.   Yes.

20   Q.   The assets of AMC as of 2012 was $964,823?

21   A.   Which year are we in?

22   Q.   I'm under the column 2012, and then your data summary --

23   A.   I've got you.

24   Q.   Okay.

25   A.   What was your question?

1   Q.  The question is:  What is the assets of the company as of

2   2012?

3   A.  The, the total invested capital would be the same as the

4   total, total assets, and that's $1,146,963.

5   Q.  And the, the return on equity is simply derived by this

6   asset number divided by the net operating income; is that

7   correct?

8   A.  Return, return on equity?

9   Q.  Yes.

10  A.  Would be net operating income divided by equity, 964,000.

11  Q.  And, of course, if the owners left more equity in the

12  company, then that ratio would drop, would it not?

13  A.  Right.

14  Q.  And the ratio is what it is simply because the amount of

15  assets of the company are relatively low compared to the net

16  operating income; is that correct?

17  A.  That's correct.

18      MR. DUSBABEK:  Your Honor, I would suggest that this

19  may be an appropriate time for the noon recess, and perhaps we

20  could get a fax to Dr. Randle.

21      MR. DUSBABEK:  And one other thing.  Could you please

22  tell us the number to which we could fax materials?

23      THE WITNESS:  I'm in a court reporter's office.  Let

24  me excuse myself for a minute and duck out and get the number.

25  May I?

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J                Randle - Cross              XV(a) - 2261

1           MR. DUSBABEK:  Okay.  Doctor, I think we can get that

2   through Mr. Logan.

3           So with the Court's permission, I'll interrupt my

4   examination, and we'll see if we can't get some documents to

5   you.

6           THE COURT:  We'll see you --

7           THE WITNESS:  Thank you.

8           THE COURT:  -- at 1:15.

9           THE WITNESS:  1:15?  I'll be back.

10           THE COURT:  We'll stand in recess, ladies and

11   gentlemen, until 1:15 o'clock.  Remember the Court's

12   admonition.  It still applies.

13       (Proceedings recessed 11:53 a.m. to 1:16 p.m.,

14         resuming outside the presence of the jury.)

15           THE COURT:  Are we ready?

16           MR. LOGAN:  Yes, Your Honor.

17           THE COURT:  We work at glacial speed.

18       (Jury in at 1:17 p.m.)

19           THE COURT:  Thank you.  Please be seated.

20           Mr. Dusbabek.

21           MR. DUSBABEK:  Thank you, Your Honor.

22           THE COURT:  Please proceed.

23           Dr. Randle, can you hear?

24           THE WITNESS:  I can.  Can you hear me?

25           THE COURT:  Yes, sir.

Julie H. Thomas, RMR, CRR                              (307)778-0078

12-CV-00088-J                Randle - Cross              XV(a) - 2262

 1              THE WITNESS:  We're in business then.

 2              THE COURT:  Are you getting your echo again, or are

 3      you okay?

 4              THE WITNESS:  I'm okay.

 5              THE COURT:  Good.

 6      Q.  (BY MR. DUSBABEK)  Dr. Randle, have you found the balance

 7      sheet for Sunridge Apartments as of September 30, 2013?

 8      A.  Yes, and I have to tell you I had seen this before.  This

 9      was part of -- I think it was the very first two pages

10      preceding the income tax returns for Sunridge.  I didn't make

11      any use of it because it's only for a one-month period of

12      time.

13      Q.  But it does address the various financial calculations of

14      assets and liabilities and so forth relative to --

15      A.  It shows -- it shows all of the assets and liabilities as

16      of September 30th in 2013 and for the prior month, which I

17      assume would be August 31st, 2013.

18              MR. DUSBABEK:  Your Honor, I've marked this as

19      Defendant's DDD, as in dog, and I'd move for its admission.

20              THE COURT:  It will be received.

21          (Defendants' Exhibit DDD received.)

22              MR. DUSBABEK:  And if I might, may I publish this to

23      the jury?  I've got copies for the jury.

24              THE COURT:  You may.

25              MR. DUSBABEK:  Thank you.


Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J            Randle - Cross            XV(a) - 2263

1   Q.  (BY MR. DUSBABEK)  Okay.  Have you had an opportunity to

2   look at this balance sheet?

3   A.  I have.

4   Q.  And I'm going to put this up on the screen.  And for the

5   jury, this has -- this is DDD that's been admitted into

6   evidence.

7           Anyway, Dr. Randle, I'd like to have you take a look

8   at the first page of DDD, and you'll see four vertical

9   columns.  We've got a description on the left that says

10  Current Assets.  Do you see that?

11  A.  That's the first item in that list, yes.

12  Q.  And then moving across the page from left to right we have

13  a column for 9/30/13.  Do you see that?

14  A.  Yes.

15  Q.  And then we have the prior month, which you indicated

16  would have been August?

17  A.  Correct.

18  Q.  And then a net change on the far right.

19  A.  Right.

20  Q.  Now, this, this summary, under 9/30, the column 9/30/13,

21  shows total assets as of that date $5,650,115.50.  Do you see

22  that?

23  A.  Correct.  Correct.

24  Q.  And if you look up the column, you'll see it's a number of

25  things, real estate, land and property 5.2 million, some

12-CV-00088-J          Randle - Cross          XV(a) - 2264

1   reserves.  Do you see that?

2   A.  Right.

3   Q.  And so then we follow the column down, we see that there's

4   a mortgage of $5,740,000.  Do you see that?

5   A.  Correct.

6   Q.  And total liabilities of $5,843,662.94.  Do you see that?

7   A.  Right.

8   Q.  And so we go to the next, page 2 of DDD, we have these

9   same columns, and the total equity is a minus $193,547.44; is

10  that right?

11  A.  Correct.

12  Q.  And if we look right above this, we have a number of

13  distributions, but they're all in parentheses.  Do you see

14  that?

15  A.  Yeah, that means they're negative distributions.

16  They -- go ahead.

17  Q.  Negative distribution would mean something that the, the

18  partner that's referenced would actually have had to make as a

19  capital contribution?

20  A.  Correct.

21  Q.  Meaning putting money into the operation?  Is that right?

22  A.  I can't tell you what happened.  It's just a -- it's

23  called a contra-liability, not a liability, but the opposite

24  of a liability.

25  Q.  And you see the, the current year profit or loss is

12-CV-00088-J          Randle - Cross          XV(a) - 2265

1    actually a loss of $103,401.57?

2    A.  Correct.

3    Q.  And that would indicate the loss year to date for January

4    through September of this year, would it not?

5    A.  No, that would just be for the month of September.

6    Q.  Oh, all right.  So this isn't an annual loss, just a

7    monthly loss.

8    A.  These are monthly statements.  That's why they, they just

9    simply don't show any useful information in terms of comparing

10   what's going on from year to year.

11   Q.  So if we look over to this next column on the second page,

12   the loss in August would have been $127,828; is that right?

13   A.  Yes, right.

14   Q.  And back up to the first page in this second column,

15   towards the bottom you'll see off to the left an indication of

16   equity and prior year distributions to an R. Ctvrtlik and a

17   J. Ctvrtlik.  Do you see that?

18   A.  Oh, down at the bottom of the page?

19   Q.  Yes.

20   A.  Yes.

21   Q.  And, again, these indicate negative distributions or --

22   what did you call it, contra-equity or contra-liability?

23   A.  Contra, contra-equity.

24   Q.  This is funds that these particular members would have had

25   to put back into the operation?

12-CV-00088-J              Randle - Cross              XV(a) - 2266

1  A.  Right.

2  Q.  Yes.

3          MR. DUSBABEK:  Your Honor, those are all the

4  questions I have for Dr. Randle.

5          Thank you, Dr. Randle.

6          THE WITNESS:  Thank you.

7          MR. LOGAN:  Dr. Randle, thanks for your time today.

8  Those are all the questions we have, and I think you can be

9  excused with the permission of the Court.

10          THE WITNESS:  Thank you very much.  Just like to wish

11  everybody a happy holiday.

12          JURORS:  Thank you.

13          MR. LOGAN:  You, too.

14          THE WITNESS:  Thank you.

15          MR. LOGAN:  Your Honor, the plaintiff does not intend

16  to call any additional witnesses, and we'll rest at this time.

17          THE COURT:  Very well.

18          MR. JONES:  Your Honor, at this time the defendants

19  would like to call Candace Capitelli to the stand.

20          THE COURT:  Please raise your right hand.

21      (The witness was sworn.)

22          COURTROOM DEPUTY:  Please be seated.

23          Please state your name and spell it for the record.

24          THE WITNESS:  Candace Capitelli, C-a-n-d-a-c-e,

25  C-a-p-i-t-e-l-l-i.


Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2267

1    CANDACE CAPITELLI, DEFENDANTS' WITNESS, DIRECT EXAMINATION

2   Q.  (BY MR. JONES)  Good afternoon, Miss Capitelli.

3   A.  Hello.

4        MR. JONES:  Good afternoon, members of the jury.

5   Q.  (BY MR. JONES)  Miss Capitelli, I know you've testified

6   before, and the jury has seen you throughout the trial, but

7   can you tell them just what your position is with AMC?

8   A.  I am a regional property manager.

9   Q.  What does that mean when you say you're a regional

10  property manager?

11  A.  I oversee a portfolio of apartment communities.  Currently

12  I have six.

13  Q.  And where are these communities located?

14  A.  I have four in Wyoming, and I have two at, um, CU in

15  Boulder, in Colorado.

16  Q.  Now, Miss Capitelli, since this lawsuit was filed, and

17  after sitting here for the past three weeks even, have you

18  learned some things about carbon monoxide?

19  A.  I certainly have, as we all have.

20  Q.  Have you learned some things about gas-fired furnaces?

21  A.  Absolutely.

22  Q.  Have you learned some things about the procedures that you

23  all were using back in 2011?

24  A.  Yes.

25  Q.  Have you changed any of those procedures?

Julie H. Thomas, RMR, CRR                      (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2268

1   A.  Yes.

2   Q.  Can you give the jury an example of maybe one of the

3   changes y'all have made in terms of the lease?

4   A.  We amended an addendum.  It's called a carbon monoxide

5   addendum.  It's two pages addressing that they -- their name

6   and apartment number is on the top and that they have a $50

7   deposit put down on their smoke or, excuse me, CO detector

8   that's been put in their apartment.  It then goes into telling

9   them what it's for, why it's there, and what needs to be done

10  to maintain it, um, a battery, if it starts to beep they need

11  to call us.  Basically all that we heard as to one of the

12  steps that needs to be taken, that the education of the

13  resident is so important.  And they now know what it is, what

14  it looks like, where it's supposed to be, and they sign the

15  addendum, and it goes in with the lease.

16  Q.  Now, what about people who maybe have been living at

17  Sunridge and aren't having the lease signed?  How is this

18  getting to them?

19  A.  We had a few people that were obviously moved in prior to,

20  um, this change, so we would, um, call them typically or give

21  them some sort of communication in e-mail or a letter on their

22  door, we're installing a CO detector in your apartment, here's

23  your addendum, please sign and return to the office.  And it

24  would just be a simple -- right on their door.  If they didn't

25  return it, then we follow up and say if it's easier, come in

1    the office, sign it, 'cause all of them have their apartment

2    number on them, they can just sign it, and then we give them a

3    copy, and they're supposed to then go in their file.

4    Q.  Now, we heard in phase one of this trial that some

5    semiannual inspections were done and CO detectors were noticed

6    missing.

7    A.  Yes.

8    Q.  Do you remember that?

9    A.  Yes.

10   Q.  What did Sunridge do in terms of missing CO detectors in

11   units to address that issue?

12   A.  Well, we made several orders to make sure we had an

13   inventory of them at all times, not, oh, we have to order one

14   so it will be a couple of days.  We always kept a inventory of

15   them on hand in the maintenance shop.  And then basically

16   making sure they had the addendum signed at that time, also.

17   Q.  Did you change the type of CO detectors that were used in

18   some units?

19   A.  We did, because in Amber's apartment we added that

20   hardwire one.  So there is a smoke CO hardwire combo detector

21   that you can buy that then goes into the ceiling into an

22   outlet.  It's hardwired into a light fixture right there.

23   Some of the light fixtures were removed, and then they would

24   put in the hardwire one.  So then if the electricity would go

25   off, the battery was the backup.  And then if it continued to

12-CV-00088-J          Capitelli - Direct          XV(a) - 2270

1   beep, then they knew, oh, gosh, you know, I've got to get a

2   battery, too, so then they would call us and let us know.

3   That's also addressed in the addendum that if it beeps, that's

4   a sign, do something, call us, we have to get you a new

5   battery.

6   Q.  So these hardwired detectors, you ordered a number of

7   these to be put throughout the complex?

8   A.  Yes.  Usually 35 at a time, just to make sure we had

9   plenty.

10  Q.  Now, what about in terms of responding to issues?  Has

11  that changed as far as if there's a question or an issue with

12  a furnace?

13  A.  Yes.

14  Q.  How so?

15  A.  It's treated like fire in so many ways.  If there's an

16  issue, I'm usually called, instead of an e-mail, Hey, Candace,

17  217, something's not right here with this.  And he'll have

18  already said to me:  I've already called John Haid, he's on

19  his way, so I'm just updating you to let you know.  We're not

20  sure what the problem is, and it's being addressed.

21  Q.  Have you relayed down the line -- I guess we should

22  establish.  You're a regional property manager.  Do the

23  properties you have have on-site managers?

24  A.  Yes.

25  Q.  Okay.  Have you relayed down the line the urgency of how

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2271

1   things should be addressed now?

2   A.  Yes.  We do have monthly safety meetings with our teams at

3   each site, so we have topics that we say, hey, this month

4   we're going to talk about, um, asbestos training.  Um, it's

5   another one of those where you have to learn what contains

6   asbestos.  So we did also a, um, safety, here, you need to be

7   aware of this issue related to CO, and letting the maintenance

8   techs, the maintenance supervisor, the housekeeper, the

9   porter, the leasing agent that's in the office.  Some sites

10  have six, seven, eight employees at them, so everybody needs

11  to know the same thing, and we were making sure that that was

12  well known.

13  Q.  So has this, these changes, have they taken place at

14  places other than Sunridge that are under your management?

15  A.  Yes.  I have another property in Rock Springs, Wyoming,

16  and it was basically a full-on setup, CO detector, CO

17  addendum, this is how we're going to move forward, this is

18  what I want you to do, this is a huge issue, and I'm not going

19  to accept anything but urgency from you.  So in my voice they

20  could hear, boy, you're kind of a little worked up about this,

21  and I would say, yes, this is important, I need you to

22  understand.

23  Q.  And did this happen before this trial?

24  A.  Yes.

25  Q.  Okay.  Now, in terms of Sunridge, let's go back to

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2272

1   Sunridge.  Have the furnaces been inspected and evaluated?

2   A.  Yes.

3   Q.  When was the first time that -- who did it the first time?

4   A.  John Haid did do several.  He did about 12, 13 of them in

5   May of this year and basically did a top-to-bottom full

6   everything, everything that they've all talked about, the

7   burners, the blower motors, and the thermocouples, and

8   cleaning the heat exchanger, and all of that that I've learned

9   now that -- what they do do when they do it, and he finished

10  that.

11  Q.  Did he make any recommendations for replacing any of the

12  units back in May?

13  A.  I don't recall that there was any recommendations to

14  replace, but he had said if -- you know, I'm gonna order a few

15  of these to have for you.  Because he's our go-to guy.  So we

16  don't want to have to have him order one, wait a couple of

17  days and then it get in, because sometimes those are hard to

18  find on a (indicating), you know, a dime.  So he ordered a

19  few, and if we needed them he was ready.

20  Q.  And have some been replaced?

21  A.  Yes.

22  Q.  How did the -- the jury knows there's the owners, Sunridge

23  Partners, and the two brothers.  Have they cooperated with

24  these new --

25  A.  Yes.


Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J        Capitelli - Direct        XV(a) - 2273

1   Q.  -- inspections and ordering new furnaces to have them on

2   site?

3   A.  Yes.  They've expressed their, um, interest in being very

4   aware of what's going on, and there may be no issues, but they

5   still ask:  Hey, how are we doing on this?  What's going on?

6   I really, you know, want to make sure that we're addressing

7   this.  Yes, we are, Jeff, Bob.  Here's what I'm doing and --

8   Q.  Now, has another company come out and evaluated and

9   inspected the furnaces?

10  A.  Yes, because John Haid is not always available now.  He's

11  got a lot of work in Casper alone.  He's one of the best in

12  Casper.  So I started reaching out to other vendors that AMC

13  uses, and we have quite a database in our website.  So there's

14  a company called CW Heating & Air that's out of Salt Lake City

15  that has come and also done work for us.

16  Q.  So at this point has every furnace at Sunridge been

17  inspected?

18  A.  Yes.

19  Q.  Um --

20  A.  I feel better knowing that.

21  Q.  Now, you mentioned this other property at Rock Springs.

22  Did you have these companies inspect the furnaces there?

23  A.  Yes.

24  Q.  Okay.  Have you relayed what you have learned to your

25  supervisors at AMC?


Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2274

1      MR. LOGAN:  Objection:  hearsay, relevance.

2      THE COURT:  Overruled.  She may answer.

3  Q.  (BY MR. JONES)  I want to know what you have said.

4  A.  To my supervisors?

5  Q.  Yes, as far as concerns or issues you may have.

6  A.  I've said a lot.  I've told them that I am a wealth of

7  information at this point, that I really feel that we need to

8  address companywide, not just on my portfolio, which I've

9  already done, but moving forward into our other states and

10 other areas where this is a potential, that I would never want

11 to even imagine that anyone would ever go through this like I

12 have, and anything preventative that I can do to educate them,

13 educate my managers, educate my fellow regionals, um, I want

14 to do.  It's not something you just sit on information and

15 never do with.  It's very important to move forward with what

16 you know and be basically a witness to saying, listen, this is

17 important.

18 Q.  You've heard -- well, I guess the jury already knows

19 Mr. Few is the on-site manager at Sunridge.

20 A.  Yes.

21 Q.  Have you been disappointed in the information you've

22 learned about him?

23 A.  I would say yes.  I haven't done his 2013 review yet, but

24 I have some issues that have arisen in my perception of what

25 has been -- how it's been handled and how things have, um,

12-CV-00088-J          Capitelli - Direct          XV(a) - 2275

1   been communicated to me.  And it concerns me, and I need to

2   make sure that moving forward it's not like that.

3   Q.  Prior to Miss Lompe's CO incident and prior to this

4   lawsuit being filed, do you think you were aware of all the

5   issues you should have been in terms of the furnaces at

6   Sunridge Apartments?

7   A.  No, I wouldn't say I was fully aware to the extent that

8   I've learned.

9   Q.  Have you communicated more now with the owners than you

10  did before?

11  A.  Yes.  Actually, we've become quite able to have very

12  candid and open conversations, because sometimes that

13  owner-client relationship is difficult, but with Bob and Jeff,

14  no, it's very easy to communicate with them.

15  Q.  And have they been supportive of making the changes --

16  A.  Yes.

17  Q.  -- at Sunridge?

18  A.  Over the topic of supportive in that, you know, like I

19  said, I tell them, and so one may not talk to the other

20  brother, and then that brother -- Bob will call me up and say

21  da-da-da, and I'll say, hey, I already talked to Jeff about

22  that, and he's like, oh, gosh, sorry, I didn't know, I hadn't

23  gotten the information yet, so thank you.  And so then I'll

24  retell it to him so he knows.

25  Q.  Now, let me talk about some of the financial issues.  Are

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2276

1   you familiar with the rents that are received at Sunridge?

2   A.  Yes.

3   Q.  And AMC, what's its relationship for Sunridge, the

4   property managers?

5   A.  AMC is the management company.

6   Q.  All right.  How does AMC make money off of that

7   relationship?

8   A.  We receive a management fee based from the management

9   agreement, and it's a percentage of income each month, income

10  line only, the effective gross income.

11  Q.  And so do you know what AMC's percentage is at Sunridge?

12  A.  It varies per property, but at Sunridge particularly it's

13  3.4 percent.

14  Q.  So is that 3.4 percent of all the rents that come in?

15  A.  Rent and any utilities that they pay.  I mean, it's all

16  income lines, and then there's one bottom, bottom line that

17  says effective gross income.

18  Q.  So if -- with the boots on the ground, so to speak, with

19  Mr. Few, if he spends a hundred dollars in maintenance or a

20  hundred thousand dollars in maintenance in a month, does that

21  affect what AMC makes?

22  A.  No, because our fee is based on income and not accounting

23  for any expenses.

24  Q.  And who ultimately pays then for the repair and, say,

25  inspection of the furnaces?

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Capitelli - Direct          XV(a) - 2277

1   A.  Sunridge Partners, because we manage their accounts for

2   them.

3   Q.  In terms of Sunridge Partners, do you know how -- whether

4   they've made money or lost money over the last 12 months at

5   Sunridge?

6   A.  They have lost money.

7   Q.  Do you know how much?

8   A.  I think roughly, when I looked at last month, somewhere in

9   75 to 79,000, negative loss.

10  Q.  And do you keep track of how much they spend on, say, HVAC

11  and furnaces over a year?

12  A.  Yes, we have a line item.

13  Q.  Do you know how much Sunridge has spent on HVAC and

14  furnaces since this incident?

15  A.  Well, given I have just started doing or finishing up

16  budgets and we have to kind of forecast, annualize on past, it

17  would be roughly around $63,000.

18  Q.  And have the Ctvrtlik brothers of Sunridge complained or

19  balked at any of the amounts that have been spent on furnaces

20  there?

21  A.  No.

22  Q.  Mr. Randle was asked some questions about AMC, and I'm

23  sure you know.  How many states does AMC do work in?

24  A.  We just expanded to now we have 13 states.

25  Q.  And how many properties are there in Wyoming?

12-CV-00088-J          Capitelli - Direct          XV(a) - 2278

1   A.  Four, and they're all mine.

2   Q.  Do you know how many properties AMC actually manages?

3   A.  Yes.  We just had a manager's meeting last month, and

4   we're over 300 at this point --

5   Q.  So three --

6   A.  -- United States wide.

7   Q.  300 properties.  And the ones in Wyoming, there's only

8   four?

9   A.  Four.

10  Q.  And those are all yours?

11  A.  They're all mine.

12  Q.  You mentioned Rock Springs.  Have you taken what you have

13  learned in this case and applied it to your properties in

14  Colorado, too?

15  A.  Yes.  I have a different owner that I work for over those

16  two.  And it can be very challenging in a student community

17  because they're very young, 19, 20, and first apartment,

18  again, the education of what is in their apartment, how do you

19  use it, you need to notice these signs.  Every August I do

20  their walk-in with them, their walk-through.  Sometimes moms

21  and dads are there, but most of the time it's the guys, and

22  they're like, hurry this up, I just want my keys, and I'm

23  like, listen, we have to go through this check sheet.  And I

24  have a two-page thing that I go through, setting your

25  utilities up and making sure, and then I show them the

Julie H. Thomas, RMR, CRR                          (307)778-0078

1    furnace, I show them where the hot water tank is, and right

2    above in the hallway, um, is their carbon monoxide detector.

3    And they get annoyed with me because I have to talk to them

4    like they're children and say, okay, do you know what carbon

5    monoxide is?  I think.  And so I have to start from square one

6    with them.  And I make it very well known that you do not

7    disable this, you do not take it out, you call me if anything

8    is wrong, your heat is not blowing, whatever.  So I kind of

9    have to scare them a little and say, listen, this is not

10   something to mess around with.  And they get it by the time

11   I'm done with them in about a half hour.  And I've even gone

12   to the extent of giving them -- we order bulk batteries of the

13   9 volts, so I'll leave them a pack of four --

14   Q.  Okay.

15   A.  -- on their counter.

16   Q.  And that's at the CU apartments?

17   A.  CU, mm-hmm.

18          MR. JONES:  Can I have one second, Your Honor?

19          THE COURT:  You may.

20   Q.  (BY MR. JONES)  I guess I need to clear something up.

21   A.  Oh, okay.

22   Q.  When you say that all the furnaces were inspected, you

23   mentioned CW Heating & Air, they're the ones who did that?

24   A.  Yes, they're the ones that did it.  Haid was not available

25   to do it, so CW came out from Salt Lake.


Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2280

1          MR. JONES:  That's all I have.  Thank you very much.

2          THE WITNESS:  Mm-hmm.

3          MR. LOGAN:  May I approach, Your Honor?

4          THE COURT:  You may.

5                    CROSS-EXAMINATION

6   Q.  (BY MR. LOGAN)  Miss Capitelli, good afternoon.

7   A.  Hello.

8   Q.  You and I met in January this year.  Do you remember that?

9   A.  Yes, in Denver.

10  Q.  At your deposition.  And you've been here for a lot these

11  last three weeks, and I'm sure that you have learned a lot.

12  A.  Yes, I have.

13  Q.  At the time that Amber was poisoned you were one of the

14  regional property managers for AMC.

15  A.  Yes.

16  Q.  How many other regional property managers work out of the

17  Denver area?

18  A.  At any given time we can have -- I think right now we have

19  six out of Denver.

20  Q.  And do you remember that I asked you about how Mr. Few's

21  job performance had been as one of the managers that worked

22  underneath you?

23  A.  Yes.

24  Q.  And you told me that you approved of his work and that he

25  had done a good job.

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2281

1   A.   Mm-hmm.  Generally, yeah.

2   Q.   And at that point in time, over the last two or three

3   years, part of your job is to go out and evaluate how Mr. Few

4   does at the property.

5   A.   Correct.

6   Q.   You actually go out there, look at the units themselves,

7   look at his job performance, and evaluate for yourself how is

8   this person doing running the complex.

9   A.   Correct.

10  Q.   And you gave him two thumbs up, didn't you?

11  A.   Yes.  At that time.

12  Q.   I also asked you back in January of this year whether

13  anything had changed at Sunridge, do you inspect differently,

14  and you said no.  Do you remember that?

15  A.   I'm sure it's in there.

16  Q.   Well, nothing had changed.

17  A.   We added the addendum.  We -- as far as specifics to

18  inspecting, that wasn't --

19  Q.   Let me refer you to page 55 of your deposition.

20  A.   Okay.

21  Q.   And if you'll find line 21.

22       Do you remember I took your deposition on

23  January 23rd, 2013 down at the law office of Montgomery

24  Kolodny in downtown Denver?  Do you remember that?

25  A.   Right, mm-hmm.

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2282

1   Q.  And you were under oath?

2   A.  Yes.

3   Q.  You had the same job.

4   A.  Yes.

5   Q.  And at page 55 I asked you:  "Have the processes of either

6   inspecting furnaces or inspecting carbon monoxide detectors

7   changed at all over the last three years that you've worked

8   for AMC?"

9          And what was your answer?

10  A.  I said no.  Can we also recall that this was in January,

11  and other --

12  Q.  Of course.

13  A.  -- things have taken place since then as well, so --

14  Q.  And in January two years had passed since the time that

15  Amber Lompe was poisoned in her apartment; isn't that true?

16  A.  I guess you could say two years.  It wasn't quite.

17  Q.  23 months?

18  A.  Was it two -- right.

19  Q.  We were short about one week probably of two years.

20         Did you and your superiors, Brenda Wright or

21  Mr. Wiseman, the president of the company, ever go out to do

22  any kind of investigation, safety seminar at Sunridge to try

23  to see what you guys could do to improve things out there?

24  A.  No.  We relied on our contractor.

25  Q.  There was never even a phone call made to follow up with

12-CV-00088-J          Capitelli - Cross          XV(a) - 2283

1   Mr. Few about what was going on after Amber was poisoned;

2   isn't that true?

3   A.  I talk to Mike almost every day.

4   Q.  Did you review Mr. Few's deposition testimony in this

5   case?

6   A.  I did not.

7   Q.  And there was never any kind of debriefing or safety

8   analysis with Mr. Few after she was poisoned, was there?

9   A.  It was just brought to light that this is an issue and we

10  have to continue to monitor and make sure that we are

11  addressing any furnace failure, repairs.  I mean, it was very

12  apparent that obviously we were still going to be calling

13  Haid's.

14  Q.  Well, you didn't even think about doing preventative

15  maintenance.

16  A.  We did in March that semiannual and replaced CO detectors.

17  Q.  Will you please turn to page 74 of your deposition,

18  Miss Capitelli.  And at page 74, line 6, I asked you,

19  Miss Capitelli:  "So in terms of preventative, proactive

20  maintenance on furnaces, is that something that you've ever

21  considered or done as a property manager?"

22          And what was your answer?

23  A.  "I've never done it."

24  Q.  Now, to be fair, you don't have a lot of experience or

25  background before you sat in this courtroom today in gas-fired

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2284

1   furnaces, do you?

2   A.  Correct.

3   Q.  But you're not the top of the food chain for this company,

4   are you?

5   A.  No.

6   Q.  In fact, you have an executive vice president --

7   A.  Yes.

8   Q.  -- over you?

9   A.  Yes.

10  Q.  And she has a president over her.

11  A.  Yes.

12  Q.  And that president is responsible for nearly 300 apartment

13  complexes across the country.

14  A.  Yes, he is.

15  Q.  Do you think that if it were important for you, as a

16  regional manager, to understand these dangers that that's

17  something that they could train you about?

18  A.  It's something I will suggest, but yeah, it sounds like a

19  good idea to me.

20  Q.  Not something that ever crossed the mind of Mr. Wiseman or

21  Miss Wright that's been passed along to you, other than what

22  you've learned sitting back in the back there during this

23  trial?

24          MR. JONES:  Objection:  foundation as to what they

25  might know or think.

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2285

1          THE COURT:  I'll sustain that objection.

2  Q.  (BY MR. LOGAN)  Have Mr. Wiseman or Miss Wright ever

3  talked to you about that?

4  A.  No.

5  Q.  Two years after Amber was poisoned there had never even

6  been a consideration to replace those furnaces out at

7  Sunridge --

8  A.  We did them on a case-by-case basis.

9  Q.  Will you turn to page 83 of your deposition, please, and

10 I'll refer you to line 19 where I asked you about that in

11 January.  Let me know when you're there.

12 A.  I'm there.

13 Q.  Okay.  I asked you, Miss Capitelli:  "Do you know whether

14 anyone at AMC or Sunridge has ever even" -- excuse me.  Let me

15 start over.

16          "Do you know whether anyone at AMC or Sunridge has

17 ever considered replacing any or all of the furnaces at that

18 property?"

19          And your answer?

20 A.  "No."

21 Q.  And I asked you:  "Not a discussion you've ever been

22 involved in?"

23 A.  "No."

24 Q.  And your answer?

25 A.  "No."

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Capitelli - Cross          XV(a) - 2286

1  Q.  You've learned --

2  A.  But it's been also established that when something

3  happens, it's addressed and taken care of.  As far as

4  discussions or considering replacing all the property, we were

5  proactive when something would happen.  I mean, there was

6  never a lag in that.  It was take care of it and get it done.

7  Q.  The furnace was replaced after it poisoned Mike Few;

8  right?

9  A.  Yes.

10  Q.  And it was replaced after it poisoned Amber Lompe; right?

11  A.  Yes.

12  Q.  Is that the kind of policy that we should rely on to keep

13  people safe?

14  A.  No, absolutely not.  That's why it's been changed.  I

15  mean, it's, it's definitely an issue.

16  Q.  Miss Capitelli, were you sitting in the courtroom when

17  Miss Brooks testified?

18  A.  Yes.

19  Q.  I know that there are other regional property managers,

20  and I know that you are not responsible for them.

21  A.  Correct.

22  Q.  But you watched her testify about the 1600 units that

23  she's responsible for, didn't you?

24  A.  Right.

25  Q.  Do you think that it should take a punitive damage phase

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Capitelli - Redirect          XV(a) - 2287

1   of a lawsuit in order for a company to do what's safe for the

2   people that rely on them?

3   A.  Well, now that the issue is out there, yeah, I mean, if

4   that's what it takes and it's information that's important,

5   there's no reason everyone should know.  Everyone should know.

6   And policies should be changed, and people should be aware.

7   That's not anything I would ever deny.

8              MR. LOGAN:  Those are all the questions I have for

9   you.

10             MR. JONES:  May I, Your Honor?

11             THE COURT:  Mr. Jones.

12                      REDIRECT EXAMINATION

13  Q.  (BY MR. JONES)  Miss Capitelli --

14  A.  Yes.

15  Q.  -- was your January 2013 deposition easy?

16  A.  No.  They're very stressful.  I had never done this

17  before.

18  Q.  When issues were raised there, too, did things change

19  after that?

20  A.  Right, that's what I said, up until that point.  I mean,

21  once you have awareness, that is different than what you were

22  aware of before.

23  Q.  And all the things that you and I talked about as far as

24  changes and what has occurred with you and your people, that

25  didn't start today in the phase two of this trial, did it?

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Jury Instructions          XV(a) - 2288

1  A.  Oh, absolutely not, no.

2          MR. JONES:  Thank you very much.

3          THE COURT:  You may step down, Miss Capitelli.

4          THE WITNESS:  Thank you.

5          THE COURT:  Any further testimony?

6          MR. JONES:  No, Your Honor.

7          MR. LOGAN:  I just wanted to -- maybe the Court could

8  remind the witness that deposition needs to be -- okay.

9          THE WITNESS:  Oh, sorry.  Where does it go?  Do you

10  need this, too?

11          THE COURT:  Any rebuttal?

12          MR. LOGAN:  No, Your Honor.

13          THE COURT:  The evidence is closed in this portion of

14  the trial.  Each party may make a brief closing.

15          Why don't I go ahead and proceed to instruct the

16  jury, and then you can make your closings.

17          MR. LOGAN:  Thank you, Your Honor.

18          THE COURT:  The instructions will be contained in

19  this little booklet that will be given to you, ladies and

20  gentlemen.  It really contains two documents.  The first

21  document is an instruction concerning punitive damages, and

22  the second document is a verdict form upon which the jury

23  would record their decision, whatever that might be.  Please

24  listen.

25          Having determined punitive damages should be imposed

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Jury Instructions          XV(a) - 2289

1   for the purposes of punishment and deterrence, you must now

2   determine the amount of the punitive damages award.  The law

3   provides no fixed standard as to the amount of such punitive

4   damages but leaves the amount to your sound discretion to be

5   exercised without passion or prejudice.  In determining the

6   punitive damage award, you should consider the following

7   factors:

8           First, punitive damages should bear a reasonable

9   relationship to the harm that is likely to occur from the

10  defendant's conduct as well as to the harm that actually has

11  occurred.  If the actual or likely harm is slight, the damages

12  should be relatively small.  If grievous, the damages should

13  be great -- should be much greater.

14          Second, the degree of reprehensibility of the

15  defendant's conduct should be considered, the duration of this

16  conduct, the degree of the defendant's awareness of any hazard

17  that the defendant has caused or is likely to cause, and any

18  concealment or cover-up of that hazard, and the existence and

19  frequency of similar past conduct are all relevant in

20  determining this degree of reprehensibility.

21          Third, if wrongful conduct was profitable to the

22  defendant, the punitive damages should remove the profit and

23  should be in excess of the profit so that the defendant

24  recognizes a loss.

25          Fourth, the financial position of the defendant.

12-CV-00088-J          Jury Instructions          XV(a) - 2290

1         And, fifth, the costs of litigation -- all of the

2    costs of litigation should be included so as to encourage

3    plaintiffs to bring in wrongdoers -- to bring wrongdoers to

4    trial.

5         Counsel, I don't think there is any figure that has

6    been given for costs of litigation at this point.

7         MR. LOGAN:  Your Honor, we have not presented a total

8    figure.  However, the jury I think can rely on some of the

9    testimony about the costs even of just the expert witnesses

10   who have been on the stand, and so I'd just ask that the jury

11   consider the evidence that's been presented already.

12        THE COURT:  Very well.

13        The last document is the verdict form.  It states:

14   We, the jury, being duly impaneled in the above-captioned

15   matter, unanimously find by a preponderance of the evidence as

16   follows:

17        Considering all of the evidence and relevant factors,

18   what amount of punitive damages do you find by a preponderance

19   of the evidence should be assessed against Sunridge Partners,

20   Limited Liability Company?  And then there is a dollar sign

21   and a block which you could write in whatever your finding

22   might be.

23        Question 2.  Considering all of the evidence and

24   relevant factors, what amount of punitive damages do you find

25   by a preponderance of the evidence should be assessed against

Julie H. Thomas, RMR, CRR                    (307)778-0078

12-CV-00088-J          Jury Instructions          XV(a) - 2291

1   Apartment Management Consultants, LLC?  Apartment Management

2   Consultants, LLC, and similarly a dollar sign and a block.

3            Dated this blank day of December, 2013, signed by the

4   presiding juror.

5            MR. LOGAN:  May I approach just for one moment, Your

6   Honor?

7            THE COURT:  Yes.

8       (At side bar.)

9            MR. LOGAN:  I, I just wanted to ask about time.

10           THE COURT:  I thought about 15 minutes apiece.

11           MR. LOGAN:  That would be great.  Could I reserve

12  five minutes for rebuttal, Your Honor?

13           THE COURT:  Yes.  Tammy.

14           MR. LOGAN:  Actually, I'll split it.  I'll do seven

15  and a half and seven and a half.

16           THE COURT:  Very well.

17           MR. LOGAN:  Thank you.

18       (End of side bar.)

19           MR. LOGAN:  With the Court's permission, I'd like to

20  use a few demonstrative slides during my closing argument --

21           THE COURT:  Proceed.

22           MR. LOGAN:  -- if I may.  Thank you.

23           THE COURT:  Have you seen those?

24           MR. JONES:  I have not.  Can I see them?

25           THE COURT:  Yes.

12-CV-00088-J         Plaintiff's Closing         XV(a) - 2292

1        We've gone green.  Our system has struggled with

2    Macintosh and Apple, throughout the trial.  I'm not sure if

3    this is Steven Jobs's revenge or Bill Gates's revenge, but

4    it's one of the two.

5        COURTROOM DEPUTY:  Tyson, plug in and see if I fixed

6    it.  I have them muted.

7        THE COURT:  Proceed.

8        MR. LOGAN:  Thank you, Your Honor.  Counsel.

9        One more job to do.  You have been so patient, and we

10   all understand.  I packed up and moved down to Cheyenne about

11   a month ago.  I know we've all been here together for a long

12   time.  Thank you for your patience and for your courage in

13   this courtroom.

14       When we're finished, you're going to go back into

15   that jury room and you're gonna have the instruction that the

16   Judge just read to you.  How do we determine the proper amount

17   of punitive damages?  I want to talk to you about the things

18   that you are instructed to consider.  There will be five

19   listed items in your instruction.

20       Reasonable relationship of the conduct to the harm.

21   Was the bad actions and failures to act related to what

22   happened to Amber?  Was it likely to hurt somebody?  Was it

23   likely to kill somebody?  You know that.  You know that

24   information.

25       The degree of reprehensibility, and there are a

1  number of things that the Court has instructed you to

2  consider.  The duration, the degree of awareness, the

3  cover-up, and frequency.  So what was actually going on out

4  there?  We've talked about that since the very first day we

5  were together.  This went on from the time that Sunridge

6  bought the property.  They knew about these furnaces.  There's

7  been a lot of discussion of how it would have been impossible

8  for anybody to know what was going on.  You've heard it for

9  three weeks now.  These brothers from California that decided

10  to invest in Wyoming, this was not their first rodeo.  From

11  2007 until 2011 they left those furnaces to endanger the

12  people in that complex.  AMC stood by and watched as their own

13  manager was poisoned, and then we watched the cover-up.  You

14  all watched it.  We watched it together.  What does that say

15  about how they really feel about Amber, about their tenants

16  who you watched testify who had no idea what they were getting

17  themselves into when they signed that lease?  We know how they

18  really treated their people.

19          Was the wrongful conduct profitable?  It would have

20  been expensive to replace the furnaces.  You heard

21  Mr. Ctvrtlik testify that if you can just put money in reserve

22  and not spend it, then you get lucky, make more money.

23  They're two states away.  How would they know whether the

24  furnaces are dangerous?  You've seen the profit.  You've

25  looked at it.  You've done the math yourselves with

12-CV-00088-J          Plaintiff's Closing          XV(a) - 2294

1   Dr. Randle.  You know how much they were making.  And that's

2   just one part of your consideration.  Sunridge and AMC

3   profited by this gamble.

4           The actual financial position of the defendant.

5   You've been instructed that Wyoming law allows you to consider

6   their financial position, Sunridge and AMC.  You've now become

7   experts in the math as well as all the other parts of this

8   trial, and I know that you will have the information in front

9   of you back in that jury room to consider how much money they

10  have.  And the reason you need to know that is that if it's a

11  mom-and-pop operation, the punishment needs to be different.

12  Where we're talking about multiple millions of dollars,

13  nothing will change unless the punishment is appropriate.

14          COURTROOM DEPUTY:  Two minutes, Counsel.

15          MR. LOGAN:  You're also to consider all of the costs

16  of litigation, and you've heard pieces of that.  You have

17  heard how expensive these experts are to come and teach you

18  what you need to know to understand the truth.  You know, we

19  could have put pictures up of Amber maybe sitting in

20  counseling looking sad.  We could have just said, hey, look at

21  her, she sounds sad, doesn't she?  What did we do to help you

22  know what happened?  She flew to Denver, she flew to

23  Las Vegas, she flew to Salt Lake for these evaluations.  You

24  saw and heard about all of these expert witnesses that came to

25  testify here in front of you.  You've heard about the years of

12-CV-00088-J        Defendants' Closing        XV(a) - 2295

1   work that goes into getting you the information, and that's

2   just one piece that you can consider in your award.

3        Your verdict form will be very simple this time.

4   There's two questions, and that's it.

5        Considering all of the evidence and relevant factors,

6   what amount of punitive damages do you find by a preponderance

7   of the evidence should be assessed against Sunridge Partners?

8   You're the experts, but this is the one time to make a change.

9   I think the right amount that you should consider is

10  $5 million against Sunridge.

11       The second question is:  Considering all the evidence

12  and relevant factors, what amount of punitive damages do you

13  find by a preponderance of the evidence should be assessed

14  against Apartment Management Consultants?  You've watched the

15  profits.  You've watched the cover-up.  You know about how

16  they really treat people.  How do we stop it?  An amount that

17  will get their attention and actually make a change is

18  $22 million.

19       How do we change what has happened?  We can't change

20  what happened to Amber, but we can put a stop to this.  It

21  takes something loud, and it takes something clear.

22       I'll reserve the rest of my time, Your Honor.

23       MR. JONES:  Your Honor, Counsel, members of the jury.

24  Difficult situation for me.  You know, as attorneys we do our

25  best to represent our clients, to make the arguments we need

12-CV-00088-J        Defendants' Closing        XV(a) - 2296

1   to make.  And in this case there are two phases.  Phase one we

2   had to address what our clients knew before the incident, and

3   that's what they were supposed to be judged on.  Now in phase

4   two you're looking at financials of our clients, you're

5   looking at what they know now, what they've done, and you're

6   being asked to punish them, punish them today.  Well, consider

7   where my clients are today and what they know now and what

8   their actions will be in the future without an astronomical

9   $22 million award or a $5 million award.

10       We've heard mom and pop, if it's mom and pop it

11  should be different.  What about brother and brother?  It's

12  two brothers who own Sunridge.  You saw some of the income and

13  statements and all that, and you've heard Miss Capitelli about

14  the Sunridge.  They're not making money since 2012.  They've

15  set aside money.  They've spent money to make Sunridge better

16  and safer.  And they continue to, and they continually will.

17       You know, Mr. Logan said something pretty, pretty

18  important in his closing statement of the first phase.  He

19  said y'all have been here for two and a half weeks and y'all

20  know more about CO and more about furnaces than you ever

21  thought and any of your friends.  Well, my clients know a lot

22  more, too, and this has been a lot longer than two and a half

23  weeks for them, and they have made changes.

24       In terms of the jury instruction and the profits, you

25  are instructed the law is that if the wrongful conduct was

Julie H. Thomas, RMR, CRR                        (307)778-0078

1  profitable to the defendant, the punitive damages should

2  remove the profit and should be in excess of the profit so

3  that defendant recognizes a loss.  The fact that AMC has

4  profits based on their work in 13 different states does not

5  mean they profited off of not getting furnaces maintained or

6  not getting furnaces replaced.  They -- you heard

7  Miss Capitelli.  AMC charges a flat percentage of the rents

8  that come in.  That's it.  They can replace every balcony,

9  every sidewalk, spend thousands of dollars, and it doesn't

10  change what AMC makes because that's paid for by the owners.

11  And if you follow that instruction, the only profits that are

12  to be considered are those that can arise from the wrongful

13  conduct.  And I'm presuming, based on your verdict and based

14  on the fact that you found punitive damages, that you found

15  that the wrongful conduct was not getting it repaired, not

16  getting it replaced, not being proactive, not being

17  responsive, not doing the things that you heard Miss Capitelli

18  say they've started doing.  Those didn't profit them, and

19  that's what the law says.

20       It also says you're not supposed to be persuaded by

21  prejudice or passion.  It's kind of odd, isn't it?  You're

22  being asked to punish somebody for their acts, but you can't

23  be persuaded by passion or prejudice.  But please try to

24  remember that.

25       I said in openings your message has been sent, and I

12-CV-00088-J        Defendants' Closing        XV(a) - 2298

1    also mentioned that when y'all first came in here through voir

2    dire, first, you never thought you'd still be here on

3    December 20th, I bet, but you were asked questions about how

4    much is too much, a hundred million, 20 million.  And some of

5    y'all struggled with that, but we've heard millions and

6    millions and millions over time, and we've gotten to where

7    $22 million profits, well, then that seems reasonable.  A

8    million dollars, that's a lot of money.  It's a lot of money.

9    The fact that a company makes money is not a crime, and it

10   shouldn't come into your consideration here.

11         The brothers who own Sunridge Partners have been

12   putting money into the place over the course of this

13   litigation.  You heard Mr. Randle.  Reserves were put in in

14   2012 to start making improvements.  That's when this case

15   started.

16         You know, Mr. Logan, he's educated some people.  It's

17   true.  But my clients have heard from him, from the experts

18   they hired, and from you when you rendered your verdict.  They

19   made some mistakes.  They're going to pay for those.  But they

20   don't need to be punished in some severe passion with punitive

21   damages in the millions and millions of dollars like what is

22   being requested.

23         The instruction tells you there's no standard,

24   there's no method.  You can award any amount, but it has to be

25   reasonable here.  It has to be something that you're really

1    comfortable with.

2          You know, it's been said throughout this case you

3    have a lot of power.  I think you saw that with your verdict.

4    You saw that with what -- that we're here again.  And I have

5    to say, you're to be complimented.  The fact that our juries

6    in this great country will sit here for this long and come

7    back for another day, when you didn't even know it would be a

8    day, it could have been more, but you're willing to do it.

9    You do have the power, but use it reasonably.  Use it in light

10   of what my clients actually did.  If you think of punitive

11   damages and punishing people, is it because they took some

12   outward conduct that you look at and go that is just

13   reprehensible that someone would do that?  And that's what the

14   instruction says.  Look at the reprehensibility of what they

15   did.  Here it's apparently what they didn't do.  I'm sure both

16   of my clients, the two brothers and AMC, wish they would have.

17         But like I told you in openings, companies are

18   people.  We hear so much now in the trends and, you know,

19   corporations make profits, corporations are bad, but if you

20   look at AMC, it's Mike Few at Sunridge, it's Miss Capitelli

21   being the regional property manager, there's a person above

22   her and a person above that, but it's these people who are

23   really doing the actions and activities that we've heard about

24   in this case.  And people make mistakes, and people don't

25   always communicate well, and sometimes we don't see things for

12-CV-00088-J        Defendants' Closing        XV(a) - 2300

1   what they should be, and sometimes we don't understand the

2   gravity of situations because that's what happens with people.

3   And that's what these companies are made up of, people.

4           Now, you heard from this -- Mr. Ctvrtlik.  They are

5   from California.  They did buy this property here.  They were

6   trying to buy a property in an area where they thought it

7   would be always rented and had a good future and a good town,

8   and that's what they did.  But they're not experts in

9   furnaces.  They're not.  They know a lot more now, that's for

10  sure, and they know a lot more to stay on management companies

11  now that maybe they relied on before.  They're people.  They

12  made assumptions.  They made mistakes.  You told them that

13  already in your verdict.

14          Even if we consider Mr. Randle's testimony of putting

15  depreciation back in for Sunridge, I mean, he admitted you

16  look at the financials, there's losses.  There's a loss at the

17  end.  You saw the sheet from September and October of this

18  year, losses.  Distributions, what were the -- what was it?  A

19  negative, because the brothers were putting money back in.

20  Instead of taking it out, they were putting it back in.  Is

21  that someone who needs to be punished at this stage?  I don't

22  think so.

23          Even if you put the depreciation back in, though, he

24  says you have a $828,000 profit over five years.  That's

25  160-some thousand a year.  That's what he says by putting

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Defendants' Closing          XV(a) - 2301

1   something back in, that he admits is typically done, and this

2   is not showing a profit.  But, again, profits have to go to

3   the wrong.  You know, this isn't a situation where my clients

4   did something knowing it was wrong so that they could make

5   more money.  There's not evidence of that.

6           And for AMC, they make the same amount of money

7   whether they do the repairs or not.  And they are doing pretty

8   well as a management company, and they are in 13 states, and

9   they do have 300 and some apartments.  You don't get there by

10  doing a bad job.  You don't get there by intentionally hurting

11  people, and neither do the owners, because if you do, the word

12  gets around, and you don't make any money, and you don't have

13  places that people want to live in.

14          People behind the scenes made some mistakes here.

15  Multimillion-dollar punitive damage awards are not gonna serve

16  any purpose except to hurt people and companies.  It's nice to

17  focus at the top, it's nice to focus on the people who are

18  making millions of dollars, but it always trickles down

19  because people are who have to respond in situations.

20          You heard Mr. Randle say that AMC had insignificant

21  assets.  They don't have assets.  They're taking in the

22  percentage of the rents.  They don't have a lot of assets.

23  You also heard him say he didn't look at the payroll.  He

24  doesn't know how many people work there, how much money was

25  being passed down in the payroll to pay for the expenses.  He

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J          Plaintiff's Closing          XV(a) - 2302

1    said, I didn't include expenses.  Now, he says, well, this is

2    the net, but he didn't want to show how much is going out to

3    the employees in the company through all that.

4         We have been here for a long time.  I really do thank

5    you for putting in the time you have.  I've watched you

6    throughout this trial.  I had one of the better seats to look

7    right at y'all.  I know you were paying attention.  I saw you

8    taking notes.  I want to thank you for taking this so

9    seriously when there's really no accountability if you didn't,

10   but you did.  I hope you've listened, and I hope you follow

11   the law that's in the instruction, and I hope you make a

12   decision here on punitives that is reasonable, because my

13   clients have learned, they do know what they did, and changes

14   have been made.  Thank you for your time.

15        MR. LOGAN:  This is the last time that I will ever

16   talk with you inside of this courtroom, I promise.  You know,

17   I just heard from defense counsel where my clients are today

18   is much different than where they were when Amber was

19   poisoned, and I thought where are they?  Where are the

20   Sunridge Partners?  Do they care?  How important is this?  One

21   of them was here for part of this experience.  Your verdict

22   will tell them, all the way on the beach in California,

23   whether this is how we treat people in Wyoming.  You know, we

24   only got to speak with one of the Ctvrtliks, and he testified

25   that how could he know if these furnaces were safe.  I mean,

12-CV-00088-J         Plaintiff's Closing           XV(a) - 2303

1    he's all the way out there.  How could he possibly know?

2              We're talking about hundreds of people's lives.  You

3    know, if you want to make a gamble in your own home, if you

4    have children I would not support that idea, but people can

5    make their own decisions, but when you decide to go into

6    business under the laws of our state renting property, you

7    take on a massive responsibility.  Take people's money and

8    give them basic human needs, walls, a roof, safe heat, don't

9    poison them, is part of the business.  They don't get to make

10   that choice that they're gonna gamble with all of these

11   people's lives.  Mr. Ctvrtlik told you under oath that he

12   cares about safety because it affects their reputation and

13   their reputation affects their ability to keep that apartment

14   complex full and make more money.  That's why he cares about

15   safety.  It's up to you to determine whether that's how we do

16   it and whether that lives up to the ideals that we expect.

17             You know, Mr. Jones said something that I think is so

18   true and so important.  In this country it's not a bad thing

19   to make money.  That's what we're built on is good businesses.

20   And you know how we support good businesses?  We keep the

21   dangerous ones from wrecking it for all of the rest of us.

22             The system is so, so fragile.  It takes a group of

23   courageous people like you to stop what we have been seeing in

24   this courtroom.  For all these years they have gambled with

25   all of these lives, and no one can stop them, no one, except

Julie H. Thomas, RMR, CRR                        (307)778-0078

12-CV-00088-J          Plaintiff's Closing          XV(a) - 2304

1   you.

2          Sunridge has told you in many different ways over the

3   last three weeks that they hired the best.  We've heard about

4   AMC's mission statement to maximize profits for their owners.

5   We've heard about how much they love safety and just how they

6   do those inspections.  And now we're hearing today that

7   they've learned something in this courtroom that somehow

8   apparently they didn't learn through all of the thousands of

9   people's lives that they have been responsible for for the

10  last however many years.  This is knowing gambling with

11  people's lives.

12          COURTROOM DEPUTY:  Two minutes, Counsel.

13          MR. LOGAN:  If AMC really cares, where are their

14  leaders?  You know, we heard from Mike Few.  Where is Greg

15  Wiseman, who made $6 million last year gambling with people's

16  lives?  Where is Brenda Barrett, this executive senior vice

17  president?

18          You've already been instructed, you read when you

19  deliberated before, that punitive damages are allowed to

20  punish the defendant and to deter others similarly situated

21  from the same kind of conduct in the future.  And so we need

22  to think about that.  How do we deter others around our

23  communities?  You know, there's a 20-year-old signing a lease

24  today somewhere in Casper, Pinedale, or Rock Springs or

25  Wheatland or right here in Cheyenne.  Is their landlord going

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J        Plaintiff's Closing            XV(a) - 2305

 1   to learn from this?  How loud does the message have to be sent

 2   so that this is not a passing story in the Wyoming

 3   Tribune-Eagle or the Star Tribune that's never even read out

 4   in California or back in Salt Lake City?  Your verdict needs

 5   to be serious enough so that it is heard loud and clear, not

 6   just a few blocks away from this courtroom.  You have the

 7   ability and the power to do that.

 8           You know, the last thing I want to talk with you

 9   about is that I don't do this for sport.  You may have seen my

10   silly little bracelet over the last few weeks.  My little boy,

11   Liam, turns six tomorrow.  He's going to grow up in Wyoming,

12   and someday he's gonna go sign a lease.  I wonder whether this

13   is gonna be a safe state for him.  Your verdict today is so

14   important for our future.  You know, sometimes we all feel

15   like we have no ability to change the world, like the laws and

16   the power structures are totally disconnected from us, things

17   that happen down here at our capitol.  Today you are the most

18   powerful body.  You are the only people who can affect the

19   future and what we have seen here.

20           I told you at the very, very beginning that this is

21   gonna be a big deal, this case will be probably the most

22   important case you have ever heard of in the state of Wyoming.

23   And it's the most important because you have the ability to

24   change our future, to go home and to tell your family and your

25   friends and your coworkers, you know, I changed the way things

12-CV-00088-J          Plaintiff's Closing          XV(a) - 2306

1   are gonna be done around here.  We stood up against the kind

2   of businesses that gamble with people's lives, and we put a

3   stop to it.  A verdict of a million or two dollars, is that a

4   lot of money?  Is that a lot of punitive damages?  It's a lot

5   of money for sure.  Will it make a change?  Will it affect the

6   future?  Will it protect our communities?  Will it be heard, a

7   verdict which is not loud enough to reach across this state

8   that you can stand up and be proud of putting a stop to this?

9   A small verdict would give them a pass for what they've done.

10  Amber will still be okay.  You've helped her.  What about the

11  rest of us?  How do we change the future?  It takes a lot of

12  courage.

13          THE COURT:  Don't use courage.  You're jurors.

14  You're citizens.  Use your reason and common sense.  We're not

15  sending you out on D-day.

16          MR. LOGAN:  You've been instructed --

17          THE COURT:  I'm just suggesting, don't flatter people

18  by laying a bunch of stuff on them.

19          MR. LOGAN:  The Court has instructed you on exactly

20  what you can consider.  This is not about passion and

21  prejudice.  This is not about being flamboyant.  This is about

22  what does it take to stop and to make a real change in our

23  society.  You are the experts.  You know, and we trust you.

24  Thank you.

25          THE COURT:  Let me introduce Mike Waddell, who will

Julie H. Thomas, RMR, CRR                          (307)778-0078

12-CV-00088-J                                          XV(a) - 2307

1    be the bailiff who is sworn here at this time.

2             Please administer the oath.

3        (Bailiff sworn.)

4             COURTROOM DEPUTY:  Thank you.

5             THE COURT:  Ladies and gentlemen, this case is now

6    submitted to you to reach your verdict.  We'll stand in

7    recess.

8             THE COURT:  Did you want them to take their --

9             COURTROOM DEPUTY:  I'll get them.

10            THE COURT:  All right.

11       (Jury out at 2:43 p.m.)

12            COURTROOM DEPUTY:  I'm only taking 69, 70, and DDD.

13            MR. LOGAN:  Their published copies she's going to

14   take back so that they just have one to share.

15            THE COURT:  I don't have any objection to having them

16   all, but you might.

17            MR. LOGAN:  I don't, but Tammy, I just listen to what

18   she says.

19            MR. JONES:  I agree with Tammy.

20            THE COURT:  Courage, now come on.

21            MR. LOGAN:  Of all the bad things I've ever said, I

22   can't even --

23            MR. JONES:  Soldiers.

24            THE COURT:  Don't go far.

25            MR. LOGAN:  We won't, Your Honor.

12-CV-00088-J                                          XV(a) - 2308

1          THE COURT:  All right.  I think they'll decide this

2    pretty quickly.

3         (Proceedings recessed 2:45 p.m.,

4         December 20, 2013.  Rendition of Verdict

5         contained in Non-Public Volume XV(b).)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3

4              I, JULIE H. THOMAS, Official Court Reporter for the

5    United States District Court for the District of Wyoming, a

6    Registered Merit Reporter and Certified Realtime Reporter, do

7    hereby certify that I reported by machine shorthand the

8    proceedings contained herein on the aforementioned subject on

9    the date herein set forth, and that the foregoing pages

10   constitute a full, true and correct transcript.

11             Dated this 25th day of January, 2014.

12

13

14

15                       /s/ Julie H. Thomas

16                    JULIE H. THOMAS
                    Official Court Reporter
17                  Registered Merit Reporter
                  Certified Realtime Reporter
18                    CA CSR No. 9162

19

20

21

22

23

24

25